IN RE CLAIMS AGAINST ATLANTA ELEVATOR, INC.
NEBRASKA PUBLIC SERVICE COMMISSION, APPELLEE AND
CROSS-APPELLEE, V. ROBERTS CATTLE COMPANY, CLAIMANT,
APPELLANT, AGP GRAIN COOPERATIVE, INC., ET AL.,
CLAIMANTS, APPELLEES AND CROSS-APPELLANTS, AND
G & W FARMS PARTNERSHIP ET AL., CLAIMANTS, APPELLEES.
685 N.W.2d 477

Filed August 20, 2004.    No. S-02-1406.

Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellant.

Jon Bruning, Attorney General, and L. Jay Bartel for appellee Nebraska Public Service Commission.

Rocky C. Weber, of Crosby Guenzel, L.L.P., for appellee AGP Grain Cooperative, Inc.

Kimberli D. Dawson and Bruce L. Hart, of Hart, Dawson & Sudbeck, P.C., L.L.O., for appellees Brian Bertrand et al.

Daniel L. Lindstrom and Nicole M. Mailahn, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellees G & W Farms Partnership et al.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
Upon the insolvency of Atlanta Elevator, Inc. (AEI), on March 11, 2002, the Nebraska Public Service Commission (PSC)

assumed title to all grain in storage at AEI for the benefit of the owners, depositors, and storers of that grain. See Neb. Rev. Stat. § 88-547 (Reissue 1999). After combining the value of the grain inventory and a grain warehouse bond, a total amount available for distribution was determined to be $1,083,259.42, and proceedings for distribution were instituted. The PSC received claims totaling $4,529,654.47.

Appellant Roberts Cattle Company (RCC) and appellees and cross-appellants AGP Grain Cooperative, Inc. (AGP); Brian Bertrand; Mark Bertrand; Max Schultz; Dave Wells; the Harley Wells estate; Dean Pape; Wells Ag Enterprises, Inc.; Neil Young; and Dennis Fulk (collectively appellants) were among the claimants who filed claims seeking to share in the distribution. A hearing was conducted on May 30 and 31, 2002. After reviewing the evidence, the PSC denied all or a portion of appellants' claims, based on its determination that with respect to the denied portions of appellants' claims, appellants were not valid owners, depositors, or storers of grain in storage at AEI at the point in time at which the PSC took title to that grain. The PSC ordered pro rata distributions in accordance with its findings. A motion for rehearing was denied. This appeal followed. We affirm the PSC's decision with regard to appellants' claims.

## II. STATEMENT OF FACTS

### 1. PSC INSPECTION AND WAREHOUSE SHORTAGE

AEI was a Nebraska public grain warehouse, licensed under the Grain Warehouse Act, Neb. Rev. Stat. § 88-525 et seq. (Reissue 1999). The PSC is the state agency authorized to enforce the provisions of the act. One of the PSC's duties is to conduct inspections of licensed warehouses. See § 88-527(1). Additionally, the PSC is required under the act to "adopt and promulgate rules and regulations to aid in the administration of" the act. § 88-545.

On March 11, 2002, the PSC warehouse examiners inspected AEI. As a result of the inspection, the PSC determined that the quantities of grain actually in storage with AEI were significantly below the amount necessary to cover AEI's apparent storage obligations. During the inspection, AEI voluntarily surrendered its grain warehouse license to the PSC. Due to the surrender, the

PSC took immediate control of AEI's facilities and all grain stored in AEI's warehouse, closed the warehouse, and, as of March 11, took title to all grain in storage in the warehouse for the benefit of the owners, depositors, and storers of grain in the warehouse at that time.

## 2. Claims Process

In accordance with §§ 88-547 and 88-530, on March 19, 2002, the PSC entered an order directing the liquidation of AEI's grain, with the proceeds from that liquidation and a warehouse security bond to be distributed to claimants deemed qualified as of March 11. Section 88-547 provides, inter alia, as follows:

> If the [PSC] determines that a shortage of grain exists [or] if a license is surrendered . . . the [PSC] may close the warehouse and do one or more of the following:
>
> (1) Take title to all grain stored in the warehouse at that time in trust for distribution on a pro rata basis to all valid owners, depositors, or storers of grain who are holders of evidence of ownership of grain. . . . Such distribution may be made in grain or in proceeds from the sale of grain; [and]
>
> (2) After notice and hearing (a) determine the value of the shortage and the pro rata loss to each owner, depositor, or storer of grain, (b) require all or part of the warehouse security to be forfeited to the [PSC], and (c) distribute the security proceeds on such pro rata basis[.]

Although not defined in the statute, a "Depositor, Storer, and/or Owner" is defined in the PSC's grain warehouse rules and regulations as "[a]ny person who has grain stored with a warehouseman. . . . Owner does not include mortgagee or pledgee." 291 Neb. Admin. Code, ch. 8, § 001.01D (2002).

Section 88-530 reads, in relevant part, that the security required of a licensed warehouse "shall run to the State of Nebraska for the benefit of each person who stores grain in such warehouse."

Pursuant to the March 19, 2002, order, the PSC required parties who claimed to be either an owner, depositor, or storer of grain with AEI on March 11 to file their claims by May 23. A hearing on such claims was set for May 30. Notice of the claims deadline and hearing date was published in several newspapers and sent to potential claimants identified through the PSC's March inspection.

On May 6, 2002, AEI filed chapter 7 bankruptcy proceedings. On May 22, the PSC entered into a stipulation in the bankruptcy case providing for the bankruptcy estate's abandonment of the grain inventories and the grain warehouse bond in the amount of $433,700. The bankruptcy court approved the stipulation.

Thereafter, pursuant to its statutory authority, the PSC liquidated AEI's grain inventories. The net proceeds from the liquidation of the grain inventories totaled $649,559.42. In addition, AEI's grain warehouse bond of $433,700 was available for distribution. Thus, a total of $1,083,259.42 (the proceeds) was available for pro rata distribution by the PSC to approved claimants.

### 3. CLAIMS HEARING

The claims hearing was held on May 30, 2002, and continued on May 31. Fifty-seven claims, totaling $4,529,654.47, had been filed with the PSC. The PSC hearing was governed by the PSC's rules of procedure, 291 Neb. Admin. Code, ch. 1 (2001), and its grain warehouse rules and regulations. The rules of procedure provide, inter alia, that although the PSC is not "bound to follow the technical rules of evidence, the record will be supported by evidence which possesses probative value commonly accepted by reasonable men in the conduct of their affairs." 291 Neb. Admin. Code, ch. 1, § 016.01. Furthermore, in accordance with the PSC's rules of procedure, the claimants had the option of appearing before the PSC on their own behalf or being represented by counsel. 291 Neb. Admin. Code, ch. 1, §§ 002.01 and 002.02. At the outset of the hearing, the PSC indicated that cross-examination of witnesses would not be permitted. The record does not reflect that any party objected to the PSC's announcement regarding cross-examination.

Thirty-three individuals testified during the claims hearing. In addition, 57 affidavits were submitted in support of claims by individuals or business entities. Sixty-eight exhibits, consisting of approximately 2,000 pages, were admitted into evidence.

On September 18, 2002, the PSC entered its "Order Determining Claims." In summary, the order reviewed the various claims which had been filed and the evidence in the record relating to such claims, and made findings. In the order, the PSC approved or denied the claims, in total or in part, based on the

PSC's determination as to whether the record demonstrated that on March 11, the date the PSC took title to the grain in storage at AEI, the claimant was an owner, depositor, or storer of that grain. Appellants are among those persons or entities whose claims the PSC denied, in total or in part, in its September 18 order.

With respect to the subject matter involved in this case, pursuant to statutes then in effect, timely motions, styled as "motions for rehearing," were filed with the PSC. See Neb. Rev. Stat. § 75-137 (Cum. Supp. 2000) (repealed by 2003 Neb. Laws 187). Those motions came on for hearing on October 24 and 30, 2002. In an order entered November 19, the PSC overruled the motions. The instant appeal was filed in December, pursuant to Neb. Rev. Stat. § 75-136 (Cum. Supp. 2002), which statute we observe has been subsequently amended. See § 75-136 (Reissue 2003).

Additional facts will be set forth below where pertinent to our analysis of appellants' arguments on appeal.

### III. ASSIGNMENTS OF ERROR

All appellants assert essentially the same assignment of error, restated, that the PSC erred in denying all or a part of their individual claims based upon the PSC's determination that with regard to the denied claim, the record failed to demonstrate that on March 11, 2002, the claimant was an owner, depositor, or storer of grain in storage at AEI. In addition to this assignment of error, both RCC and AGP claim that the PSC denied them due process during the claims hearing.

We note that G & W Farms Partnership, Gray Farms Partnership, and Jimmie "Jim" Lindstrom have also filed a single brief in this court, in which they identify themselves both as appellants and appellees. In their brief, these parties do not assign any error and instead generally argue in support of the PSC's September 18, 2002, order entered following the claims hearing. Because G & W Farms Partnership, Gray Farms Partnership, and Lindstrom have not challenged on appeal the PSC's determination with respect to their claims, these parties are not included in our definition of "appellants," and their claims and the PSC's decision with respect to those claims will not be further discussed in this opinion. See *Misle v. HJA, Inc.*, 267 Neb. 375, 382, 674 N.W.2d 257, 263 (2004) (stating that to be considered on appeal,

"an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error").

Furthermore, we note that claimants Mark Nelson and Kallen Kuck initially appeared as cross-appellants in this appeal and were represented by the same counsel. Their attorney filed separate motions to withdraw as their counsel and sent copies of the respective motions to Nelson and Kuck by certified mail. This court granted the motions to withdraw. No substitute counsel entered an appearance for either Nelson or Kuck, and neither Nelson nor Kuck submitted a brief in this appeal. Accordingly, these parties are not included in our definition of "appellants," and their claims and the PSC's decision with respect to those claims will not be further discussed in this opinion. See, generally, Neb. Ct. R. of Prac. 10B (rev. 2000).

## IV. STANDARDS OF REVIEW

The appropriate standard of review for these appeals from the PSC is a review for errors appearing on the record. See *In re Proposed Amend. to Title 291*, 264 Neb. 298, 646 N.W.2d 650 (2002). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusion independent of the determination made by the administrative agency. *In re Application of Neb. Pub. Serv. Comm.*, 260 Neb. 780, 619 N.W.2d 809 (2000).

The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the tribunal below. See *Professional Bus. Servs. v. Rosno, ante* p. 99, 680 N.W.2d 176 (2004).

## V. ANALYSIS

### 1. Appellants' Substantive Challenges to Denied Claims

#### (a) Statutory Meaning of §§ 88-547 and 88-530

The primary issue in this appeal is appellants' assertion that with regard to their individual denied claims, the PSC erred in its

determination that at the time the PSC took title to all grain stored in the AEI warehouse on March 11, 2002, appellants were not owners, depositors, or storers of grain, and thus, they were not entitled to a pro rata share of the proceeds. The PSC reached this determination pursuant to the authority granted it under § 88-547, which provides, inter alia, as follows:

If the [PSC] determines that a shortage of grain exists [or] if a license is surrendered . . . the [PSC] may close the warehouse and do one or more of the following:

(1) Take title to all grain stored in the warehouse at that time in trust for distribution on a pro rata basis to all valid owners, depositors, or storers of grain who are holders of evidence of ownership of grain. . . . Such distribution may be made in grain or in proceeds from the sale of grain; [and]

(2) After notice and hearing (a) determine the value of the shortage and the pro rata loss to each owner, depositor, or storer of grain, (b) require all or part of the warehouse security to be forfeited to the [PSC], and (c) distribute the security proceeds on such pro rata basis[.]

Resolution of appellants' claims involves statutory interpretation. The meaning of a statute is a question of law, and a reviewing court is obligated to reach its conclusion independent of the determination made by the administrative agency. *In re Application of Neb. Pub. Serv. Comm., supra.* We have previously stated that in discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Simon v. City of Omaha,* 267 Neb. 718, 677 N.W.2d 129 (2004). Further, a court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless; it is not within the province of a court to read anything plain, direct, or unambiguous out of a statute. *Id.*

Under § 88-547, inter alia, if the PSC determines that a grain shortage exists or if the license of the warehouse has been surrendered to the PSC, pursuant to § 88-547(1), the PSC is to "[t]ake title to all grain stored in the warehouse at that time . . ." for subsequent distribution. Applying the statute's plain language, it is

apparent that § 88-547 establishes a temporal requirement, that is, a point in time at which the rights of entities claiming to be either "owners, depositors, or storers" of grain are fixed. According to § 88-547(1), an entity's status is determined "at that time" at which the PSC takes title to the grain stored in the warehouse, and it is an entity's status as an owner, depositor, or storer of grain in storage at such time that determines such entity's right to subsequently receive a pro rata distribution of the proceeds.

Section 88-547(1) also contains a physical requirement. Section 88-547(1) provides that at the time the PSC takes possession of the grain, the grain is to be "stored in the warehouse." Given the temporal and physical requirements of § 88-547(1), the statute effectively gives a preference to claimants who meet these requirements as compared to other individuals or entities who do not meet the requirements but nonetheless may have rights against the insolvent warehouse. Thus, significant to our analysis of the PSC's decision with regard to the individual appellants' claims in this appeal, is an assessment of the right as of March 11, 2002, of each appellant to grain actually in storage at AEI on March 11, the time at which the PSC took title to the grain stored in the warehouse.

We note that in addition to the liquidation of grain stored at the warehouse, the proceeds available for distribution included AEI's warehouse bond. In this connection, we note, as quoted *supra*, that § 88-530, relating to the bond, provides, in relevant part: "The security shall run to the State of Nebraska for the benefit of each person who stores grain in such warehouse . . . ." Given the nature of the claims in this case, potential beneficiaries of the security under § 88-530 other than "person[s] who store[] grain" are not relevant to this case.

The components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed in pari materia to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *Arthur v. Microsoft Corp.*, 267 Neb. 586, 676 N.W.2d 29 (2004). We consider §§ 88-547(1) and (2) and 88-530 together. We read the word "security" in § 88-547(2)(b) and (c) to mean the warehouse bond. See § 88-530. Section 88-547(2)(c) states that distribution of the security proceeds is to

be done on "such pro rata basis." We read "such" in the expression "such pro rata basis" in § 88-547(2)(c) as referring back to "pro rata" used in § 88-547(2)(a) in which pro rata refers to the loss to be compensated to each owner, depositor, or storer of grain. Thus, the distribution of the security proceeds under § 88-547(2)(c) is to be made pro rata to the owners, depositors, and storers of grain, which group we have determined must meet the temporal and physical requirements of § 88-547(1) to be eligible to share in the proceeds. Accordingly, given the facts of this case, we conclude that distribution of the portion of the proceeds attributable to the warehouse bond pursuant to § 88-547(2), must be made to claimants who meet the temporal and physical requirements which are contained in § 88-547(1).

### (b) Appellants' Denied Claims

#### (i) RCC

RCC asserts under a variety of theories that the PSC erred in denying its claim in which it alleged it was the owner of 102,592 bushels of corn, with an approximate value of $192,000. The PSC determined that on March 11, 2002, RCC was neither an owner, depositor, nor storer of grain at AEI. Finding no error on the record relative to this determination, we reject RCC's arguments on appeal.

RCC's claim of ownership is based primarily on two warehouse receipts issued by AEI, receipts Nos. B665911 and B665949. RCC asserts that these two receipts demonstrate it had purchased grain which was being stored at AEI on March 11, 2002. The PSC rejected this argument.

The record reflects that receipt No. B665911 was issued on July 26, 2001, purportedly showing RCC's purchase of 25,000 bushels of corn from AEI. There is evidence that RCC later took delivery of 22,408 bushels of corn under receipt No. B665911, leaving a balance of 2,592 bushels of corn.

The record reflects that receipt No. B665949 was issued on February 21, 2002, and purportedly showed RCC's previous purchase of 100,000 bushels of corn from AEI on January 14, 2000. In this connection, the record also contains an internal RCC document signed by J. Daniel Roberts, RCC's managing partner, that memorializes the purchase of 100,000 bushels of corn from AEI

on January 14, 2000. According to this document, the corn was to be delivered to RCC "whenever [it] want[ed] it," and the point of delivery was "RCC." Elsewhere on the document is the notation, "RCC . . . prepaid this."

The record also includes an affidavit from Roberts. With regard to receipt No. 665911, Roberts stated that this receipt represented RCC's purchase of 25,000 bushels of corn from AEI on July 26, 2001, and that RCC paid a total of $49,250 to AEI for the corn. In his affidavit, Roberts stated that receipt No. B665949 was a reissued receipt that was prepared by AEI to replace the original January 2000 receipt. Roberts asserted in his affidavit that the receipt was reissued at AEI's request, after AEI stated that it "wanted 'to make the Warehouse Receipt more current.'" With regard to that particular transaction, Roberts stated that on January 14, 2000, RCC issued a check to AEI for the purchase of the corn. A copy of that check is contained in the record, and in the memo section of the check is the notation "pre-pay corn." Roberts further stated that AEI agreed to waive storage charges on the purchased corn as an inducement for their arrangement and that the corn was to be delivered to RCC at RCC's request.

In his affidavit, Roberts stated that RCC had routinely purchased "thousands of bushels of corn [from AEI] for delivery at [RCC] facilities. In these instances, corn was paid for with delivery to follow." Roberts stated that on those occasions, he recognized that "title to the grain did not pass until the grain was delivered and [RCC] was at risk until actual delivery of the grain." As to the transactions represented by receipts Nos. 665911 and 665949, however, Roberts stated that on those two occasions, RCC "did not desire immediate delivery" and that he and an AEI representative had discussed the topic that title to the grain would pass to RCC upon payment and the issuance of the warehouse receipts.

The record also contains the testimony of Sherry Peterson, AEI's office manager, whose responsibilities included maintaining AEI's financial books, records of sales, and contracts. Peterson testified in general with regard to AEI's business practices and as to specific transactions involving various claimants. With regard to AEI's grain sales to RCC, Peterson's testimony contradicted Roberts' affidavit, in that Peterson testified to the

effect that AEI did not consider title to the grain to have passed to RCC until the grain was delivered to RCC.

When considering RCC's claim, the PSC stated in its order that according to the practice of the grain warehouse industry, title to grain did not pass until it had been delivered, and that when the buyer took possession of the purchased grain, the buyer turned over the warehouse receipt to the warehouse, in accordance with § 88-540 and 291 Neb. Admin. Code, ch. 8, § 002.08E. As to receipt No. 665911, the PSC found that RCC had retained the warehouse receipt notwithstanding partial delivery and that its failure to surrender the receipt denied it protection under 291 Neb. Admin. Code, ch. 8, § 001.01D. The PSC determined that RCC was a creditor as to the remaining value encompassed by receipt No. 665911.

With regard to receipt No. 665949, the PSC noted numerous documents in the record reflected that the parties intended the corn purchase to be a prepay arrangement, in which RCC paid in advance for corn to be delivered at a future date. Referring to the evidence, the PSC determined that RCC had "only made 'advances' to AEI and did not purchase the grain 'in store.'" Thus, the PSC determined that notwithstanding the existence of receipts, the evidence did not demonstrate title to the corn that RCC claimed had in fact passed to it. According to the PSC, RCC was, "at best . . . a lender or a mortgagee [to AEI], not an owner of grain." Regarding receipt No. 665949, the PSC noted that the fact that RCC had not been assessed storage charges by AEI was consistent with its determination that title to the corn did not pass to RCC until it was delivered to RCC. The order on rehearing was to the same effect. Accordingly, the PSC determined that on March 11, 2002, RCC was not an owner, depositor, or storer of grain at AEI, and was not entitled to a pro rata distribution of the proceeds.

On appeal, RCC raises various arguments challenging the PSC's determination. RCC initially claims that the PSC's decision is not supported by competent evidence. We disagree.

The record contains several documents reflecting that RCC was prepaying, or paying in advance, for the corn noted on the warehouse receipts. The grain was to be delivered to RCC at some unstated future date or dates, "whenever [it] want[ed] it."

Roberts, RCC's managing partner, acknowledged that RCC had purchased corn from AEI on numerous occasions and that in RCC's course of dealing with PSC, RCC did not normally consider title to grain it had purchased from AEI to pass from AEI to RCC until the grain was actually delivered. Roberts stated that until that delivery occurred, RCC was assuming the risk of loss. Roberts' affidavit testimony to the effect that he and an AEI representative had discussed that title to the grain would pass to RCC upon the issuance of the warehouse receipts at issue was directly contradicted by Peterson's testimony to the effect that AEI did not consider the title to the corn had passed to RCC until RCC had taken delivery. Given the evidence, the PSC resolved the conflicts in the record and determined that RCC's transactions with AEI, represented by receipts Nos. 665911 and 665949, were not actual purchases of corn, but, rather, were the advance of sums or prepayments for corn.

In reviewing a decision of the PSC, it is not the province of an appellate court to weigh or resolve conflicts in the evidence or the credibility of the witnesses; rather, an appellate court will sustain the decision of the PSC if there is evidence in the record to support its findings. See *In re Proposed Amend. to Title 291*, 264 Neb. 298, 646 N.W.2d 650 (2002). If there is evidence to sustain the findings of the PSC, an appellate court cannot substitute its judgment for that of the PSC. *Id.* Determinations by the PSC are a matter peculiarly within its expertise and involve a breadth of judgment and policy determination that will not be disturbed by an appellate court in the absence of a showing that the action of the PSC was arbitrary or unreasonable. *Id.*

The PSC's determination that on March 11, 2002, RCC was not an owner, depositor, or storer of grain at AEI, and thus, was not entitled to share in a distribution of the proceeds is supported by competent evidence in the record, and we reject RCC's argument on appeal to the contrary.

RCC also asserts that the PSC erred by failing to rely on the provisions of article 7 of the Nebraska Uniform Commercial Code pertaining to "Documents of Title." See Neb. U.C.C. § 7-101 et seq. (Reissue 2001). RCC refers in particular to §§ 7-202(1), 7-207(2), and 7-401. In summary, RCC argues that under article 7, the warehouse receipts represented its entitlement

to stored grain without regard to delivery. In support of this assertion, RCC argues in effect that under article 7, the receipts are sufficient to pass title. Contrary to RCC's argument on appeal, the PSC did not deny RCC's claim because of a determination that the warehouse receipts were defective, nor did the PSC deny RCC's claim because the goods were fungible and commingled. Rather, the PSC determined that based upon the evidence, AEI and RCC were involved in a prepayment arrangement for the corn, the receipts did not eclipse the arrangement, and pursuant to the arrangement and consistent with the custom in the industry, title did not pass to RCC until the corn was delivered to RCC. Assuming, arguendo, that the receipts upon which RCC relies show a future entitlement to the quantity of grain reflected therein, contrary to RCC's claim, the record does not support its assertion that such grain was, in fact, stored at AEI on March 11, 2002. Thus, even considering the receipts, which may provide RCC with a basis for relief elsewhere, the PSC's determination in this case is controlled by § 88-547 and is supported by competent evidence.

Finally, RCC argues that the PSC's determination, which rejected RCC's assertion that the receipts conclusively show that title to grain transferred to it, violates public policy. We do not agree. The language of § 88-547 as written by the Legislature makes clear that a successful claimant must be an owner, depositor, or storer of grain at the time the PSC takes title to the grain stored in the warehouse. The facts failed to establish that RCC was an owner, depositor, or storer at AEI on March 11, 2002. In the absence of such a showing, the Legislature has determined there is no entitlement to the proceeds.

We have previously recognized that it is the function of the Legislature through the enactment of statutes to declare what is the law and public policy of this state. *State v. Warriner*, 267 Neb. 424, 675 N.W.2d 112 (2004). Pursuant to the provisions of § 88-547, the Legislature has declared that it is the public policy of this state that an entity's status as an owner, depositor, or storer of grain and its entitlement to a pro rata share of the proceeds are to be determined at the time the PSC takes title to the grain. It is properly the province of the Legislature, and not this court, to make such a policy determination. *Danler v. Rosen*

*Auto Leasing*, 259 Neb. 130, 609 N.W.2d 27 (2000). Thus, we find no merit to RCC's argument that the PSC's decision violates public policy.

### (ii) AGP

AGP asserts under a variety of theories that the PSC erred in denying its claim as set forth in its claim affidavit, in which it alleged it was the owner of 197,500 bushels of corn and 170,000 bushels of soybeans with a total value of $931,366.61. The PSC determined that on March 11, 2002, AGP was neither an owner, depositor, nor storer of grain at AEI. Finding no error on the record relative to this determination, we reject AGP's arguments on appeal.

AGP's claim of ownership is based on eight warehouse receipts, Nos. B665933, B665934, B665935, B665938, B665943, B665944, B665947, and B665948. AGP asserts that the eight receipts demonstrate that it had purchased grain which was being stored at AEI on March 11, 2002. The PSC denied AGP's claim because either the grain had been delivered and AGP had failed to surrender the receipts, or the "receipts" were in actuality advances to AEI, at best in the nature of collateralized receipts.

The record includes the eight warehouse receipts upon which AGP relies and various signed contracts between AEI and AGP, some of which refer to advances against warehouse receipts. In addition to these receipts and contracts, the record contains the testimony and an affidavit from Donald A. Woodburn, AGP's director of marketing. Woodburn indicated in his affidavit that AGP took delivery on some grain, and the record shows that some grain, pursuant to contract and corresponding to receipts at issue, had been delivered. Woodburn further testified that when AGP paid money to AEI relative to the grain referenced in the receipts, it intended to obtain title to the grain at that time. Woodburn acknowledged, however, that AGP did not pay storage charges on any of the grain referenced in the receipts for which it had not taken delivery.

With regard to AEI's records concerning its transactions with AGP, the record contains two separate single-page documents dated February 28, 2002, entitled "[AEI] Sale Contract Report by

Patron." One document is labeled "Commodity: Corn," and the second is labeled "Commodity: Soybeans." These documents reflect a total of eight AGP transactions with AEI, three for corn and five for soybeans. Under each AGP transaction listed is a "Remarks" section, containing either the notation "PPD," "90% PPD," "PPD 90%," or "90% Advanced."

During the hearing, the PSC examined Peterson with regard to the business practices between AEI and AGP. Consistent with the two documents noted immediately above, Peterson testified in effect that AEI would issue collateralized warehouse receipts to AGP in exchange for AGP's payment of advances for future grain. The substance of Peterson's testimony was to the effect that AEI considered title to the grain referenced in the receipts would pass to AGP after delivery of the grain to AGP.

Finally, the record reflects that AGP held several federal grain warehouse licenses. As a result of these licenses, AGP was required to report to the federal government, among other items, receipted grain it owned in Nebraska that was stored in warehouses other than its own. The completed reporting document (Statement) is in the record, and the space in the Statement regarding commodities stored in other warehouses is blank. The details of this completed Statement are as follows: The Statement, dated August 12, 2002, is entitled "U.S. Department of Agriculture . . . Warehouseman's Statement and Examiner's Comparison of Obligations and Stock." The Statement lists AGP as the "Warehouseman." The Statement includes a "Warehouseman's Certification," which provides, in pertinent part, that the warehouseman "certif[ies] to the . . . U.S. Department of Agriculture, subject to penalties of applicable laws for knowing false representations and similar offenses . . . that the information contained in the above Warehouseman's statement is, to the best of [the warehouseman's] knowledge and belief, a true, correct and complete statement." Below this certification is a space containing the signature of AGP's treasurer as the "Warehouseman or Authorized Agent." Although the Statement contains spaces for AGP to list corn and soybeans in "Other Warehouses For Storage," AGP has left those spaces empty, thereby advising the government that it had no ownership of grain in other warehouses in Nebraska.

Based on the evidence, the PSC denied AGP's claim. As an initial matter, the PSC determined that several of the receipts and the contracts referenced in those receipts had been satisfied by delivery and that AGP failed to surrender its receipts. Thus the PSC determined that those receipts had no residual value. With regard to the remaining receipts, the PSC concluded that these receipts showed AGP was not an owner but a creditor, having made advances to AEI for the future purchase of grain. The PSC concluded the receipts were at best "collateralized receipts" held to secure advances made by AGP to AEI. Accordingly, the PSC determined that on March 11, 2002, AGP was not an owner, depositor, or storer of grain at AEI and was not entitled to a pro rata distribution of the proceeds.

On appeal, AGP challenges the PSC's determination and raises certain arguments similar to those raised by RCC and rejected *supra*. AGP also states that there is evidence in the record of "*agreements to sell* the underlying commodity from [AEI] to AGP," brief for cross-appellant AGP at 21, and, although acknowledging the existence of "advances," asserts that such advances "resulted in actual sales and deliveries," *id.* at 20. AGP claims that the PSC's decision is not supported by competent evidence. We disagree.

The record, some of which is summarized above, contains evidence supporting the PSC's determination that some of the grain reflected in "the receipts upon which AGP base[d] its claim ha[d] already been delivered to AGP." The record thus supports the PSC's decision that certain receipts have no residual value. Based on the foregoing, AGP was not an owner, depositor, or storer of grain represented by these receipts.

With regard to other receipts, the PSC determined that AGP's transactions with AEI were not actual purchases of grain for which AGP took title at the time the receipts were issued, but, rather, were the advance of sums for the future purchase of grain. Indeed, AGP's brief on appeal refers to "advances." Evidence, including Peterson's testimony and other documents in the record, supports the PSC's determination that rather than title passing upon the making of the contracts, the receipts reflected advances on future purchases for which title had not yet passed. In this regard, we note that the signed contracts contained in the record incorporate

the "National Grain and Feed Dealers Association" trade rules which provide that title passes upon delivery.

As noted earlier in our analysis, an appellate court will sustain the decision of the PSC if there is evidence in the record to support its findings. *In re Proposed Amend. to Title 291*, 264 Neb. 298, 646 N.W.2d 650 (2002). Contrary to AGP's claim, the PSC's determination that on March 11, 2002, AGP was not an owner, depositor, or storer of grain at AEI and, thus, was not entitled to share in a distribution of the proceeds is supported by competent evidence.

AGP also asserts that the PSC's determination is contrary to case law and to various provisions of the Nebraska Uniform Commercial Code. The cases upon which AGP relies are distinguishable. For example, whereas AGP claims to be a buyer and thus a storer of grain, *State ex rel. P. Serv. C. v. R. F. Gunkelman & Sons, Inc.*, 219 N.W.2d 853 (N.D. 1974), refers to the rights of sellers of grain as reflected in warehouse receipts. Further, although AGP may have certain rights against AEI, given the evidence, AGP's arguments based on the code do not establish that AGP was an owner, depositor, or storer of grain at AEI on March 11, 2002, for purposes of § 88-547(1). We have considered each of AGP's assertions and found such assertions to be without merit. The PSC's determination is neither arbitrary nor capricious, and it is supported by competent evidence.

### (iii) Brian Bertrand, Mike Bertrand, Max Schultz, Dave Wells, and Harley Wells Estate

Brian Bertrand, Mike Bertrand, Schultz, Wells, and the Harley Wells estate challenge the PSC's decision only to the extent it denied a portion of their respective claims alleging ownership of grain sold to AEI. We find no merit to these appellants' arguments and conclude that with regard to the denied portions of these appellants' claims, the PSC did not err.

With respect to the denied claims of each of these appellants, the evidence in the record reflects that the grain had not been delivered to AEI, but instead was "direct-shipped" to various other locations. The PSC denied these claims based upon its determination that the evidence demonstrated that the grain had not been delivered to AEI, and thus, none of the grain at issue was

actually in storage at the warehouse on March 11, 2002. In accordance with the provisions of § 88-547, the PSC determined that because the grain at issue was not in storage at the time the PSC took title to the grain, Brian Bertrand, Mike Bertrand, Schultz, Wells, and the Harley Wells estate were not "owners, depositors, or storers" of grain at AEI. Accordingly, the PSC determined that as to this portion of these appellants' claims, these appellants were not entitled to a pro rata distribution of the proceeds.

On appeal, Brian Bertrand, Mike Bertrand, Schultz, Wells, and the Harley Wells estate assert that the PSC erred in denying their grain claims. In summary, these appellants claim that the PSC was incorrect in its determination that because the grain had been physically delivered to locations other than AEI, they were not owners, depositors, or storers of grain at AEI under § 88-547.

As we have stated earlier in our analysis, § 88-547 contains both a temporal and a physical requirement. In order for owners, depositors, or storers to take part in the pro rata distribution of the proceeds, their grain must be stored in the warehouse at the time the PSC takes title to the grain. Further, under § 88-526(3), "[g]rain in storage" is defined as "grain which has been received at any warehouse." In the instant case, the record contains evidence demonstrating that with regard to the claims at issue, the grain of these appellants was not stored in the warehouse on March 11, 2002. We agree with the PSC's application of § 88-547 to these claims. Accordingly, we find no merit to the argument raised on appeal by Brian Bertrand, Mike Bertrand, Schultz, Wells, and the Harley Wells estate, and we conclude that the PSC did not err in its determination to deny a portion of these appellants' claims.

### (iv) Dean Pape; Wells Ag Enterprises, Inc.; and Neil Young

Pape, Wells Ag Enterprises, and Young argue on appeal that the PSC erred in denying their respective claims alleging ownership of grain sold to AEI. We reject their argument and conclude that the PSC did not err in its determination that on March 11, 2002, Pape, Wells Ag Enterprises, and Young were not owners, depositors, or storers of grain at AEI.

The record reflects that each of these appellants entered into a separate "Priced to Arrive Contract" with AEI, in which they were listed as the sellers and AEI was listed as the buyer. The respective contracts provided for the sale of a specified amount of grain to AEI, at an undetermined price. The contracts also contained delivery dates on which the grain would be delivered to AEI. Under the terms of these appellants' priced-to-arrive contracts with AEI, these appellants agreed that "title to the above grain passe[d] from Seller to the Buyer on the date of execution of [the] contract." AEI's records introduced into evidence indicate that each of these appellants had delivered grain to AEI on dates generally corresponding to the delivery dates listed in the priced-to-arrive contracts.

The PSC found that each of these appellants had already sold their grain and transferred title to AEI under their respective priced-to-arrive contracts prior to March 11, 2002, and that thus, these appellants were not the owners, depositors, or storers of grain in storage at AEI at the time the PSC took title to the grain. Accordingly, the PSC determined that as to these claims, these appellants were not entitled to a pro rata distribution of the proceeds.

On appeal, Pape, Wells Ag Enterprises, and Young assert that the PSC erred in denying their claims. In summary, these appellants claim that they did not understand the terms of the contract and that notwithstanding the terms of the contract, they did not intend to sell grain to AEI. These appellants also argue that because the priced-to-arrive contracts did not contain a specified price, the contracts were incomplete and therefore unenforceable. We do not find merit to these arguments.

It is generally held that courts will not permit a party to avoid a contract into which that party has entered on the grounds that he or she did not attend to its terms, that he or she did not read the document which was signed and supposed it was different from its terms, or that it was a mere form. *Omaha Nat. Bank v. Goddard Realty, Inc.*, 210 Neb. 604, 316 N.W.2d 306 (1982). Thus, we reject the argument of these appellants that the contracts are unenforceable because they did not understand the terms of the priced-to-arrive contracts.

Further, we have previously noted that contracts involving the sale of grain are generally governed by article 2 of the Nebraska Uniform Commercial Code. See, generally, *Sack Bros. v. Great Plains Co-op*, 260 Neb. 292, 616 N.W.2d 796 (2000) (discussing applicability of article 2 to "hedge-to-arrive" grain contracts). Neb. U.C.C. § 2-204(3) (Reissue 2001) provides, in part, that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness . . . ." With regard to an open price term, Neb. U.C.C. § 2-305(1) (Reissue 2001) provides, in part, that parties "can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if . . . nothing is said as to price." Thus, although the priced-to-arrive contracts did not contain a price term, these appellants are incorrect in their assertion that this open term renders the contracts unenforceable.

The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the tribunal below. See *Professional Bus. Servs. v. Rosno, ante* p. 99, 680 N.W.2d 176 (2004). Based upon our independent review of the terms of these appellants' priced-to-arrive contracts, we determine that the PSC did not err in finding that Pape, Wells Ag Enterprises, and Young had each sold their grain to AEI under their respective priced-to-arrive contracts, and thus, they were not the owners, depositors, or storers of grain in storage at AEI at the time the PSC took title to the grain. Accordingly, the PSC did not err in its determination that as to these claims, these appellants were not entitled to a pro rata distribution of the proceeds.

### (v) Dennis Fulk

Fulk argues on appeal that the PSC erred in assessing storage charges against his allowed claim. In summary, the PSC approved Fulk's claim for corn and soybeans stored at AEI, but offset against the claim storage charges of $33,864.48 for grain held at the elevator. On appeal, Fulk claims that the PSC erred in assessing the storage charges. Fulk argues that he had an agreement with AEI that he would not be charged storage charges in exchange for AEI's use of Fulk's storage bins and equipment at no charge.

The record fails to reflect that Fulk's purported arrangement with AEI was memorialized in a written agreement, and other than his own testimony, Fulk offered no proof of the arrangement. Further, one of AEI's "Patron Grain Settlement" sheets for Fulk includes an adjustment for storage, which adjustment is inconsistent with Fulk's assertion that he would not be charged for storage. In view of the evidence, we determine that the PSC's decision assessing storage charges against Fulk's approved claim is supported by competent evidence and is neither arbitrary nor capricious. We affirm the PSC's decision with regard to the assessment of storage charges.

### 2. APPELLANTS' PROCEDURAL CHALLENGE: DUE PROCESS

RCC and AGP both argue on appeal that the PSC erred in denying them procedural due process during the claims hearing. RCC and AGP both assert, in summary, that as a result of the PSC's refusal to allow them the opportunity to cross-examine Peterson during the claims hearing, they were denied due process. AGP further asserts that the PSC's receipt of an exhibit after the claims hearing had begun, and its subsequent refusal to admit into evidence an exhibit AGP offered during proceedings on the motion for rehearing, denied AGP due process. We conclude these arguments are without merit.

We have recognized that although "the required procedures may vary according to the interests at stake in a particular context, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Marshall v. Wimes*, 261 Neb. 846, 851, 626 N.W.2d 229, 234-35 (2001). With regard to proceedings before an administrative agency or tribunal, we have stated that procedural due process requires notice, identification of the accuser, factual basis for the accusation, reasonable time and opportunity to present evidence concerning the accusation, and a hearing before an impartial decisionmaker. *Id.*

The PSC's rules of procedure, 291 Neb. Admin. Code, ch. 1, did not bind the PSC to the technical rules of evidence. The record in the instant appeal shows that notwithstanding the lack of opportunity to cross-examine Peterson, the parties were afforded the opportunity to present both documentary and testimonial

evidence in support of their claims at the claims hearing, and that RCC and AGP did in fact present such evidence. A review of the record shows that testimony and documents that contradicted RCC and AGP's claims were also admitted. The receipt of an exhibit after the claim hearing had begun and the refusal of the PSC to accept new evidence at the rehearing did not amount to a denial of due process.

As reflected in its order, the PSC considered all of the evidence before reaching its decision. Given the record and the procedure afforded, we cannot say that RCC or AGP was denied due process.

### 3. REMAINING ARGUMENTS ON APPEAL

We have reviewed appellants' remaining arguments on appeal, and we find them to be without merit.

## VI. CONCLUSION

After reviewing the record, we conclude that the PSC did not err by denying claims based upon its determinations challenged on appeal that at the point in time that the PSC took title to the grain in storage at AEI, appellants were not valid owners, depositors, or storers of grain. Accordingly, the decision of the PSC is affirmed.

AFFIRMED.