In re Claims Against Pierce Elevator.
John A. Fecht, director, Grain Warehouse Department,
Nebraska Public Service Commission, appellee and
cross-appellee, v. Matthew Christensen, claimant,
appellant, and Donnelly Trust et al., claimants,
appellees and cross-appellants, David Uecker,
claimant, appellee and cross-appellee, and
Linda Alfs et al., claimants, appellees.

___ N.W.2d ___

Filed September 11, 2015.    No. S-14-899.

1. **Public Service Commission: Appeal and Error.** Determinations of the Public Service Commission are reviewed de novo on the record.
2. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.
3. **Public Service Commission: Constitutional Law: Administrative Law.** The Public Service Commission's authority to regulate public grain warehouses is purely statutory, in contrast to its plenary authority to regulate common carriers under Neb. Const. art. IV, § 20.
4. **Public Service Commission: Administrative Law.** The authority of the Public Service Commission in the case of a grain warehouseman must spring from legislative enactment, and nothing else.
5. **Constitutional Law: Jurisdiction: Equity.** Neb. Const. art. V, § 9, confers equity jurisdiction upon the district courts.
6. **Jurisdiction: Equity.** Equity jurisdiction of the district courts is exercisable without legislative enactment and exists independently of statute.
7. **Jurisdiction: Equity: Legislature.** Equity jurisdiction of the district courts may not be divested by the Legislature.
8. **Administrative Law.** Administrative agencies have no general judicial powers, such as equitable powers, notwithstanding that they may perform some quasi-judicial duties.

9. ____. Only a judicial tribunal, and not an administrative agency acting as a quasi-judicial tribunal, can provide relief that is within the general power of the court to provide.

10. **Constitutional Law: Administrative Law: Courts.** Unless permitted by the constitution, under the principle of separation of powers, an administrative agency may not perform purely judicial functions or interfere with the court's performance of those functions.

11. **Public Service Commission: Administrative Law.** When the Public Service Commission adjudicates claims under the Grain Warehouse Act, its objective is to determine those owners, depositors, storers, or qualified check holders at the time a warehouse is closed.

12. **Public Service Commission: Jurisdiction: Time.** The Public Service Commission has limited jurisdiction under the Grain Dealer Act to determine the claims that exist on the date of a warehouse closure.

13. **Statutes: Intent.** Statutes which effect a change in the common law or take away a common-law right should be strictly construed, and a construction which restricts or removes a common-law right should not be adopted unless the plain words of the statute compel it.

14. **Actions: Equity: Jurisdiction.** An action in equity must be founded on some recognized source of equity jurisdiction.

15. **Rescission: Fraud.** Fraud and misrepresentation give rise to the remedy of rescission of a contract.

16. **Actions: Rescission: Equity.** An action for rescission sounds in equity.

17. **Actions: Trusts: Equity.** An action to impose a constructive trust is an equitable action.

18. **Public Service Commission: Administrative Law: Time.** The Grain Warehouse Act establishes a temporal requirement, or a point in time at which the rights of entities claiming to be either owners, depositors, or storers of grain are fixed, and a physical requirement that the grain be stored in a warehouse at the time the Public Service Commission takes possession of the grain.

19. **Sales.** Issuance of a check under Neb. Rev. Stat. § 88-530 (Reissue 2014) occurs when the check is first delivered by the maker or drawer.

20. **Appeal and Error.** To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

21. ____. Errors that are assigned but not argued will not be addressed by an appellate court.

22. **Parol Evidence: Contracts.** The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement that alters, varies, or contradicts the terms of a written agreement.

23. ____: ____. The parol evidence rule is designed to preserve the integrity and certainty of written documents against disputes arising

from fraudulent claims or faulty recollections of the parties' intent as expressed in the final writing.

24. **Contracts.** Extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous.

25. ____. A determination as to whether an ambiguity exists is made as a matter of law and on an objective basis, not by the subjective contentions of the parties.

26. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

27. **Contracts: Intent.** When a contract is unambiguous, the intentions of the parties must be determined from the contract itself.

28. **Testimony: Parol Evidence: Parties: Intent.** Testimony seeking to prove the parties' intent is considered parol evidence.

29. **Contracts.** An argument that the party did not read or understand the document he or she was signing is no defense to the formation of a contract.

30. **Directed Verdict: Evidence: Proof.** Prima facie proof is evidence sufficient to submit an issue to the fact finder and precludes a directed verdict on the issue.

31. **Administrative Law: Statutes: Sales: Evidence: Proof.** Although the statutes and regulations prescribe one form of evidence to establish a prima facie case that an in-store transfer occurred, other forms of evidence may also provide proof.

32. **Actions: Parties: Standing.** A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the subject matter of the controversy.

33. **Standing: Jurisdiction: Justiciable Issues.** As an aspect of jurisdiction and justiciability, standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify the exercise of the court's remedial powers on the litigants' behalf.

34. **Standing: Proof.** In order for a party to establish standing to bring suit, it is necessary to show that the party is in danger of sustaining a direct injury as a result of anticipated action, and it is not sufficient that one has merely a general interest common to all members of the public.

35. **Standing: Jurisdiction.** If the party appealing the issue lacks standing, the court is without jurisdiction to decide the issues in the case.

Appeal from the Public Service Commission. Affirmed in part, and in part reversed and dismissed.

Rocky C. Weber and Andrew C. Pease, of Crosby Guenzel, L.L.P., for appellant.

Richard P. Garden, Jr., Austin L. McKillip, and Gregory S. Frayser, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellees Donnelly Trust et al.

Douglas J. Peterson, Attorney General, and L. Jay Bartel for appellee John A. Fecht.

Heavican, C.J., Connolly, Stephan, McCormack, and Cassel, JJ., and Pirtle, Judge.

McCormack, J.

# I. NATURE OF CASE

This appeal arises out of proceedings initiated by the Nebraska Public Service Commission (PSC) following the insolvency of Pierce Elevator, Inc. (PEI), to determine claims under the Grain Warehouse Act[1] and the Grain Dealer Act.[2] PEI voluntarily surrendered its grain warehouse license to the PSC on March 4, 2014, and the PSC took title to all PEI grain in storage in trust for all valid owners, depositors, or storers of grain pursuant to the Grain Warehouse Act. The PSC then determined valid claims under the Grain Warehouse Act and the Grain Dealer Act. The appellant and cross-appellants are claimants who are dissatisfied with the PSC's classification of their claims.

# II. BACKGROUND

## 1. PEI

PEI operated licensed grain warehouses in Pierce, Randolph, and Foster, Nebraska. Brian Bargstadt was PEI's president and one-third owner.

PEI maintained a banking relationship with Citizens State Bank (the Bank) and obtained operating loans from the Bank.

---

[1] Neb. Rev. Stat. §§ 88-525 through 88-552 (Reissue 2014).

[2] Neb. Rev. Stat. §§ 75-901 through 75-910 (Reissue 2009).

PEI borrowed funds from the Bank on a line of credit to facilitate the purchase of grain from its producers.

PEI's accountant testified that PEI was "in trouble" by the end of 2012 and that PEI needed to raise capital to address the negative owner's equity. At the end of 2012, PEI had a working capital deficiency in excess of $2.2 million.

On August 30, 2013, PEI's line of credit matured and the Bank permitted the line of credit to go past due until September 19. On that date, the Bank and PEI entered into a new contract extending the due date until October 31. The Bank agreed to continue to extend the maturity of PEI's line of credit on a monthly basis while PEI, its accountant, and the Bank addressed the working capital deficiency. Bargstadt testified that he requested the monthly extensions of the line of credit "[t]o satisfy John Fecht [the director of the PSC's grain warehouse department]" because "he wanted to know if we had money in our account to pay our bills and pay the grain."

During this time, the PSC became concerned about PEI's ability to pay producers. The PSC intensified its scrutiny of PEI because PEI's grain warehouse and dealer's licenses were set to expire at the end of September 2013. The PSC's grain warehouse department's director, John A. Fecht, expressed his concern that the Bank had not extended its line of credit for another year, stating:

> With harvest coming soon, it is imperative that I know you have money available to pay for any grain expense or anything else for that matter. . . .
>
> . . . .
>
> It would seem that there is still uncertainty with the bank going forward . . . . You realize that if things would go bad, it will mean the license and the ability to continue will come to a halt.

The PSC then began to require PEI to submit bank account and loan balances to the PSC every 3 days.

In the months ensuing, PEI attempted to work out a solution to its impending insolvency. On March 3, 2014, Fecht sent an e-mail to the Bank, stating:

> I'm hoping you folks have made a decision on whether you're renewing this line of credit in the short term or long term? . . .
>
> I really need to know if the bank will continue to honor checks written by [PEI] for today and going forward. . . . I must look after the farmers doing business with [PEI].

The Bank officials met on March 3, 2014, and decided to terminate the loan relationship with PEI. The Bank informed Bargstadt the afternoon of March 3 that the Bank would not renew the line of credit. The PSC learned of the Bank's decision not to renew the line of credit and to no longer honor PEI's checks via an e-mail sent the evening of March 3.

## 2. PSC Claims

PEI voluntarily surrendered its grain warehouse license on March 4, 2014, and on March 5, the PSC entered an order closing PEI's warehouse locations and taking title to all grain in storage in trust for distribution to all valid owners, depositors, or storers of grain pursuant to the Grain Warehouse Act. The PSC also was required to determine valid claims against PEI's grain dealer bond pursuant to the Grain Dealer Act.

The PSC examined PEI's records and compiled possible claims, and then mailed claim forms to potential warehouse and dealer claimants. After receiving returned claim forms, the PSC held a hearing on July 8, 2014, to take evidence to determine valid claimants under the Grain Warehouse Act and the Grain Dealer Act.

The PSC ultimately approved warehouse claims totaling $4,620,184.02. This amount was satisfied in full by proceeds from the sale of grain in storage.[3] The proceeds from the

---

[3] See 291 Neb. Admin. Code, ch. 8, § 002.05B (2014).

grain in storage were in excess of the amount necessary to settle the grain warehouse claims. According to the PSC's order, "[i]n the event that any proceeds from the sale of grain remain after all valid claims are satisfied, the remainder will be returned to [PEI]."

The PSC also approved dealer claims totaling $3,342,793.54. Under the Grain Dealer Act, the only monetary relief available for satisfaction of these claims was PEI's required statutory bond in the amount of $300,000.[4] This bond provided each dealer with $.09 per $1 for each approved claim.

### 3. David Uecker Transaction

In mid-January 2014, PEI was in need of money to make payments to producers. Bargstadt called an official at the Bank and requested an advance to cover outstanding checks, but the official refused. Bargstadt contacted a local farmer, David Uecker, and asked Uecker to loan PEI $800,000. Uecker agreed to give PEI the money. As collateral, Uecker took a security interest in 200,000 bushels of corn at $4 per bushel. Thereafter, PEI repaid Uecker $200,000.

The PSC determined that Uecker was entitled to an approved grain dealer claim on the remaining amount of $600,000. Uecker is not an appellant or a cross-appellant in this appeal, but the PSC's determination of his claim as a dealer claim is disputed by some of the cross-appellants. These cross-appellants argue that the $600,000 was a secured loan and should not be classified as a dealer claim and prioritized against the dealer bond.

### 4. Daniel Gansebom

On December 24, 2013, Daniel Gansebom contracted to sell 75,000 bushels of corn to PEI with delivery to be completed by March 2014. The contract provided that title to the grain passed to PEI upon delivery, stating "[t]itle to, all rights

---

[4] § 75-903(4).

of ownership and risk of loss of the grain shall remain in Seller until physical delivery to Buyer's designated **Delivery Location** whereupon it shall pass to Buyer." In November 2013, pursuant to a separate contract, Gansebom had also agreed to sell additional corn to PEI.

Between October 31, 2013, and January 27, 2014, 84,442.33 bushels of corn were picked up from Gansebom by PEI and delivered to Elkhorn Valley Ethanol, L.L.C.; Husker AG, LLC; and Agrex Inc. (third-party grain terminals). None of the corn was delivered directly to PEI. Of those bushels, 75,000 were in satisfaction of Gansebom's obligation under the December 2013 contract, and the additional 9,402.51 bushels were applied to Gansebom's obligation under the November 2013 contract.

PEI prepared check No. 43157 in the amount of $321,350.25 as payment under the December 2013 contract. Gansebom avers that Bargstadt told him that this check was dated March 3, 2014, and stored in PEI's safe at that time. The check was delivered to Gansebom on July 8. However, the funds in PEI's accounts were insufficient to pay the check and Gansebom has not been paid for any of the 84,442.33 bushels of corn picked up by PEI.

At the proceedings before the PSC, Gansebom claimed the 84,442.33 bushels were stored grain, arguing he sold the grain to PEI only as a result of PEI's fraudulent inducement. Additionally, Gansebom claimed he should be treated as a qualified check holder with regard to his claims related to check No. 43157.

The PSC classified Gansebom's claims as dealer claims and denied recovery because the "loads were not delivered within the thirty-day coverage period of the bond." Further, the PSC found that Gansebom agreed to direct deliver 135,000 bushels of corn. The PSC found that the grain was direct delivered in partial satisfaction of a contract and that the remainder of the contract was voided by Gansebom and PEI and, therefore, could not constitute a claim against the dealer bond.

### 5. DONNELLY TRUST

Donnelly Trust, with the assistance of its contracted farm manager, owns and operates a farm in northeast Nebraska. During the fall of 2013, the trust harvested and delivered corn and soybeans to PEI's facilities in Pierce and Randolph for storage. The trust received scale tickets evidencing that the corn and soybeans were delivered to Pierce and Randolph and held there by PEI in open storage.

Donnelly Trust's farm manager testified that it was his standard practice to call PEI and ask PEI to sell the trust's grain in storage at a point in time when he felt commodity prices had reached a level favorable to the farm. This sale was initiated through the manager's telephone call, and the contract was executed orally. PEI and the manager would agree on a price at the time of his call. The manager testified that storage stopped at the time he called PEI to sell the grain. PEI would typically pay for the sold grain by mailing a check, which the trust usually received anywhere from 2 to 15 days after the sale.

On February 24, 2014, Donnelly Trust decided to sell certain amounts of corn and soybeans from open storage to PEI. Also on February 24, PEI executed checks Nos. 43095, 43081, and 43080, which were made payable to the trust. The checks were in the total aggregate amount of $136,010.51.

However, PEI did not deliver the checks to Donnelly Trust prior to the PSC takeover on March 5, 2014. Upon learning that the PSC held the checks executed by PEI, the trust made demand for delivery of the checks. The PSC did not deliver the checks.

Donnelly Trust made a claim in the proceeding before the PSC for treatment as a qualified check holder. However, with regard to portions of checks Nos. 43095, 43081, and 43080, the PSC denied the trust's qualified check holder claims, specifically stating that title to the grain passed to PEI when the agreement to sell from open storage was reached. More generally, the PSC found that the language of § 88-530 is

susceptible to differing reasonable interpretations. In looking at the context of the Grain Warehouse Act as a whole, the PSC stated that "[p]roducers have a responsibility to be prudent and reasonable businesspeople and seek payment for sold grain in a timely fashion" and that the act is "clearly intended to encourage timely demand for payment by producers and timely payment by warehousem[e]n."

Donnelly Trust's grain dealer claims were also denied because the deliveries were completed outside the 30-day coverage period of the grain dealer bond.

## 6. TTK INVESTMENTS, INC.

TTK Investments, Inc. (TTK), owns and operates a farm in northeast Nebraska. During the fall of 2013, TTK harvested and delivered corn to PEI's facilities in Pierce and Randolph for storage. TTK received scale tickets evidencing that the corn was delivered to Pierce and Randolph and held by PEI in open storage.

On February 24, 2014, TTK sold 5,615.61 bushels of corn from open storage to PEI. The contract was executed, and PEI prepared check No. 43083 as payment for the corn sold by TTK. The check was for the total amount of $22,003.50 and was dated February 24, 2014. PEI did not deliver the check prior to the PSC takeover of PEI on March 5.

TTK made a claim to the PSC as a qualified check holder. The PSC denied TTK's qualified check holder claim, specifically stating that title to the grain passed to PEI when the agreement to sell from open storage was reached. On appeal, TTK challenges the PSC's finding. TTK also appeals the PSC's classification of Uecker's claim as an approved dealer claim.

## 7. CURT RAABE

Curt Raabe is a farmer in Pierce County, Nebraska, and was a customer of PEI from approximately 2004 until its closure on March 5, 2014. During the fall of 2013, Raabe harvested 7,192.99 bushels of soybeans. In September and

October 2013, PEI picked up the soybeans from Raabe's farm and transported the soybeans to PEI's open storage facility in Pierce. Raabe received scale tickets evidencing that the soybeans were delivered to Pierce and held by PEI in open storage.

On February 5, 2014, Raabe executed a contract, selling his soybeans in open storage to PEI. Thereafter, Raabe did not receive payment on account of the sale, and on February 25, Raabe contacted Bargstadt regarding the missing payment. Bargstadt informed Raabe that a check had been written. Raabe demanded immediate payment. On February 28, Raabe received check No. 42900 in the amount of $88,510.54, which was the amount due on the sale of the soybeans from open storage. On March 3, Raabe deposited the check, and on March 6, it was returned for insufficient funds.

Raabe filed a claim seeking to participate in the distribution of the proceeds from the sale of grain in the warehouse as a qualified check holder. The PSC found that Raabe was not a qualified check holder because he was not an owner of grain stored in the warehouse within 5 business days prior to the closure of the warehouse.[5]

Raabe challenges this finding on appeal. He also argues that Uecker's claim should not have been classified as a dealer claim.

### 8. James Herian and Diane Herian

James Herian and Diane Herian are corn farmers in Pierce County. The Herians were customers of PEI, and their practice was to store some of their corn in on-farm storage bins and store any excess corn in storage at PEI's warehouse. In accordance with this practice, during the 2013 corn harvest, the Herians delivered 37,543.78 bushels of corn into PEI's warehouse. At that time, the Herians did not sell the grain to PEI, but instead directed that their corn be placed in open storage at PEI's warehouse. Despite the Herians' understanding

---

[5] See § 88-530.

that their grain would be stored at PEI, the Herians' bushels were instead taken directly to third-party grain terminals.

In January 2014, the Herians decided to sell 9,801.428 bushels of their corn that they believed to be in storage at PEI to PEI. The Herians were paid for this January 2014 sale.

After the January 2014 sale, the Herians were still uncompensated for the 27,742.05 remaining bushels of corn that they believed they held in open storage at PEI. James stated he did not learn that the remaining bushels had been direct delivered in the fall of 2013 to other locations instead of the PEI facility until after the PSC closed PEI. The Herians never agreed, orally or by written contract, to sell the remaining bushels to PEI or to any other third party. The Herians were never paid for the remaining bushels. James avowed that Bargstadt told him he owed the Herians money as a result of mishandling the remaining bushels and that Bargstadt indicated he would give the Herians cattle to make up for the mishandling.

When the PSC took control of PEI, the Herians obtained a grain settlement sheet, in which their bushels were listed under "Open Storage." The location code of the bushels is listed as "010." The deputy director of the PSC's grain warehouse department explained that a location code of 10 is used to identify grain delivered to other locations. He also testified that PEI's computer software used a default setting of "open storage" on all transactions.

When the PSC prepared claim forms for the Herians, the PSC indicated that their claim was a grain "dealer" claim. And the PSC denied the Herians' claim. The PSC reasoned that the corn was not in storage at the warehouse but that instead, the corn had been directly delivered to third-party grain terminals. Because PEI had completed no in-store transfer document or notice, the PSC found the Herians' claim was a dealer claim. Since the grain had been delivered beyond the 30-day coverage period for the grain dealer bond, the Herians were not allowed recovery under the Grain Dealer Act.

The Herians appeal, arguing the PSC should have found that the Herians were owners of the 27,742.05 remaining bushels of corn in open storage at PEI's warehouse at the time of PEI's closure and that therefore, the Herians' claim should have been classified as a warehouse claim and not as a dealer claim. In the alternative, the Herians argue that the PSC should have placed a constructive trust upon their bushels of corn by reason of PEI's fraudulent conduct.

### 9. Matthew Christensen

Matthew Christensen is a farmer in Pierce County. Christensen delivered 38,628.05 bushels of corn to PEI for which he holds scale tickets proving receipt of the corn by PEI and delivery of the corn into open storage under his name. As a matter of practice, Christensen never sold his grain using unpriced or priced-later (delayed-price) contracts, but limited any cash-forward contract sales of grain to set price contracts at current or near term delivery dates.

On February 7, 2014, an employee of PEI called Christensen at the request of Bargstadt. Christensen testified that the employee asked him to come to the offices of PEI to sign a form requested of PEI by the PSC. When Christensen arrived at PEI, the employee gave him a form entitled "Delayed Price Contract #9133" and was told that the form needed to be executed by Christensen and faxed to the PSC before the close of business that day. Christensen averred that he "reviewed Contract #9133" and "noted that there was no set price, there was no basis month, basis or price fix date identified even though the contract language purported to require that information."

Christensen testified that he signed the contract solely for the reason that he believed the PEI employee's representation to him that the PSC required PEI to obtain the signed document from him and that the document merely verified the number of bushels of corn that he had in storage at PEI at the time. Christensen testified that he believed the contract

to be a "form" requested by the PSC which reported and verified the number of bushels Christensen stored at PEI. Christensen testified that he did not believe it was a document that would transfer title of Christensen's stored corn. Christensen also averred that his "course of dealing" with PEI had never included entering into a delayed-price contract. The PEI employee testified that she knew the document was a contract, but that she did not recall her conversation with Christensen or whether she mentioned that the PSC was involved in the document.

Bargstadt also testified that he did not consider a delayed-price contract to be a sale of corn which transferred title. Bargstadt stated "delayed price is not a sale." Instead, Bargstadt described the intent of PEI with this contract as "Christensen still has [a] say about [the] bushels because he hasn't sold them. They're — they're his until they're sold . . . ." With respect to priced-later grain, Bargstadt testified that "the day [the PSC] closed us down, all the grain that's in delayed pricing or priced later, this [grain is] all in the elevators and everybody deserves to have that grain back."

The PSC had not requested that PEI have Christensen sign any form or contract for delivery to the PSC. Instead, pursuant to contract No. 9133, PEI transferred the 38,628.05 bushels of corn from open storage to priced-later contract status on its daily grain position report on February 3, 2014. February 3 was 4 days before Christensen testified that he signed the contract. The contract, as signed, stated, "Title to, all rights of ownership and risk of loss of the grain shall remain in Seller until physical delivery to Buyer's designated **Delivery Location** whereupon it shall pass to Buyer." Christensen admits that he signed the contract, but asserts that he did not intend to transfer title to the corn or enter into a contract to price his corn at a later date.

Christensen filed a claim asserting that he was an owner, depositor, or storer of corn in PEI as of the date of its closure by the PSC and that the contract was void or voidable by

reason of fraud. The PSC denied Christensen's claim, finding that ultimately, Christensen was not an owner, depositor, or storer of grain and that "the relief sought by . . . Christensen on the basis of his allegations of fraud must be sought in the scope of a private action against the appropriate parties and not within the scope of this claims hearing."

Christensen appeals, arguing that the PSC erred in finding the contract effectively transferred title to his grain and in failing to assert jurisdiction over his fraudulent inducement claim.

### III. ASSIGNMENTS OF ERROR

Cross-appellants Donnelly Trust, Raabe, and TTK appeal the PSC's classification of their claims as dealer claims and not as qualified check holder claims.

Cross-appellant Gansebom appeals the classification of his claim as a dealer claim rather than as a warehouse claim and the refusal of the PSC to classify Gansebom as a "storer of grain with regard to the 84,442.33 bushels of corn which were delivered as a result of PEI's fraud."

Cross-appellants the Herians appeal the PSC's classification of their claim as a dealer claim rather than as a warehouse claim. The Herians also argue that the PSC should have imposed a constructive trust upon the Herians' claimed bushels due to PEI's fraudulent conduct.

Appellant Christensen appeals the PSC's finding that the delayed-price contract he signed was enforceable, despite his lack of intent to enter into a contract transferring title to his grain. Alternatively, Christensen argues that he was fraudulently induced to execute the contract and that the PSC should have exercised its jurisdiction to adjudicate the fraudulent inducement claim as a part of the July 2014 proceedings.

Cross-appellants Donnelly Trust, Raabe, TTK, and Gansebom appeal the PSC's grant of Uecker's dealer claim in the amount of $600,000, instead of classifying it as a secured loan.

## IV. STANDARD OF REVIEW

[1,2] Determinations of the PSC are reviewed de novo on the record.[6] In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.[7]

## V. ANALYSIS

### 1. PSC Does Not Have Jurisdiction Over Equitable Claims

Appellant Christensen argues that the PSC erred in failing to find that he was fraudulently induced into executing the delayed-price contract and that the PSC erred in determining that it lacked jurisdiction to adjudicate this fraud claim. Cross-appellants the Herians and Gansebom argue that the PSC failed to find that a constructive trust should have been imposed upon grain in storage by reason of PEI's fraudulent conduct. They also ask that their contracts be voided or rescinded due to PEI's fraudulent conduct. They reason that in the scope of its limited proceedings the PSC did not have jurisdiction to address such equitable claims. We agree.

[3,4] The PSC's authority to regulate public grain warehouses is purely statutory, in contrast to its plenary authority to regulate common carriers under Neb. Const. art. IV, § 20.[8] "The authority of the [PSC] in the [case of a grain warehouseman] must spring from legislative enactment, and nothing else."[9]

---

[6] Neb. Rev. Stat. § 75-136(2) (Cum. Supp. 2014); *Telrite Corp. v. Nebraska Pub. Serv. Comm.*, 288 Neb. 866, 852 N.W.2d 910 (2014).

[7] *Id.*

[8] *In re Complaint of Fecht*, 224 Neb. 752, 401 N.W.2d 470 (1987); *In re Complaint of Fecht*, 216 Neb. 535, 344 N.W.2d 636 (1984).

[9] *In re Complaint of Fecht, supra* note 8, 216 Neb. at 539, 344 N.W.2d at 639.

[5-7] Neb. Const. art. V, § 9, confers equity jurisdiction upon the district courts.[10] This equity jurisdiction is exercisable without legislative enactment and exists independently of statute.[11] Further, this equity jurisdiction may not be divested by the Legislature.[12]

[8-10] In contrast, as a general rule, administrative agencies have no general judicial powers, such as equitable powers, notwithstanding that they may perform some quasi-judicial duties.[13] "Only a judicial tribunal, and not an administrative agency acting as a quasi-judicial tribunal, can provide relief that is '"within the general power of the court"' to provide."[14] Unless permitted by the constitution, under the principle of separation of powers, an administrative agency may not perform purely judicial functions or interfere with the court's performance of those functions.[15]

[11] By statute, the PSC is given jurisdiction over, among other things, "Grain pursuant to the Grain Dealer Act and the Grain Warehouse Act and sections 89-1,104 to 89-1,108."[16] More specifically, under the Grain Warehouse Act, the PSC explicitly is given the power to "close the warehouse and [t]ake title to all grain stored in the warehouse . . . in trust for distribution . . . to all valid owners, depositors, or storers of grain who are holders of evidence of ownership of grain."[17] Additionally, the PSC "determine[s] the value of the shortage

---

[10] See *Charleen J. v. Blake O.*, 289 Neb. 454, 855 N.W.2d 587 (2014).

[11] See, *State, ex rel. Sorensen, v. Nebraska State Bank*, 124 Neb. 449, 247 N.W. 31 (1933); *Hall v. Hall*, 123 Neb. 280, 242 N.W. 607 (1932).

[12] *State, ex rel. Sorensen, v. Nebraska State Bank, supra* note 11.

[13] *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012).

[14] *Id.* at 650, 820 N.W.2d at 62 (quoting *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998)).

[15] 73 C.J.S. *Public Administrative Law and Procedure* § 94 (2014).

[16] Neb. Rev. Stat. § 75-109.01(2) (Reissue 2009).

[17] § 88-547(1)

and the . . . loss to each owner, depositor, or storer of grain."[18] Read in conjunction with other provisions of the act, the PSC is to determine which claimants receive the "priority lien" under the act.[19] That priority may only be given to "valid owners, depositors, or storers of grain who are holders of evidence of ownership of grain"[20] or those who hold a check for purchase of grain stored in such warehouse which was issued by the warehouse licensee not more than 5 business days prior to closure of the warehouse.[21] When the PSC adjudicates claims under the Grain Warehouse Act, its objective is to determine those owners, depositors, storers, or qualified check holders at the time a warehouse is closed.

[12] Under the Grain Dealer Act, the PSC explicitly is given the power to "demand that such dealer's security be forfeited and may place the proceeds of the security in an interest-bearing trust until it fully determines each claim on the security. The [PSC] shall disburse the security according to each claim determined."[22] This statute gives the PSC limited jurisdiction to determine the claims that exist under the Grain Dealer Act on the date of a warehouse closure.

[13,14] Statutes which effect a change in the common law or take away a common-law right should be strictly construed, and a construction which restricts or removes a common-law right should not be adopted unless the plain words of the statute compel it.[23] Since it is a matter of common law that administrative bodies do not have juridical powers, such as equitable jurisdiction, unless otherwise conferred by statute, we will not read such equitable powers into the PSC's

---

[18] § 88-547(2).

[19] See §§ 88-547 and 88-547.01.

[20] § 88-547.01(2).

[21] § 88-530. See, also, 291 Neb. Admin. Code, ch. 8, § 002.18C5 (2014).

[22] § 75-906.

[23] *In re 2007 Appropriations of Niobrara River Waters, supra* note 13.

jurisdiction unless the statute explicitly says to do so. An action in equity must be founded on some recognized source of equity jurisdiction.[24]

[15-17] Fraud and misrepresentation give rise to the remedy of rescission of a contract.[25] An action for rescission sounds in equity.[26] Further, an action to impose a constructive trust is an equitable action.[27]

The sole duty of the PSC in these proceedings is to determine who has a claim under the Grain Warehouse Act and the Grain Dealer Act at the time of the closure of the warehouse. The determination of these claims is a limited proceeding.

The acts do not address the common-law theories of fraud, nor do they confer equitable jurisdiction on the PSC. Theories which ask for rescission of a contract or imposition of a constructive trust are equitable in nature. Therefore, the PSC was correct in limiting its jurisdiction in these proceedings and declining to exercise jurisdiction to determine the fraud claims. In its order determining claims in this case, the PSC properly recognized the limits of its statutory authority and the absence of any authority to grant equitable relief. The PSC was correct to decline jurisdiction over Gansebom's claims of fraudulent misrepresentation, concealment, and operation of a "Ponzi scheme" and correct to decline to impose a constructive trust. Further, the PSC was correct in declining to impose a constructive trust as a result of the fraud alleged by the Herians. Finally, the PSC was correct to decline to adjudicate the fraud claims of Christensen and to rescind or void his contract with PEI.

---

[24] *Hornig v. Martel Lift Systems*, 258 Neb. 764, 606 N.W.2d 764 (2000).

[25] See, *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011); *Bauermeister v. McReynolds*, 253 Neb. 554, 571 N.W.2d 79 (1997).

[26] *Cao v. Nguyen*, 258 Neb. 1027, 607 N.W.2d 528 (2000).

[27] *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

It very well may be true that all of these claimants are entitled to some form of relief against PEI based on claims of fraud or other wrongdoing. However, the Grain Warehouse Act and the Grain Dealer Act simply do not allow all forms of relief through its terms. The limited scope of those acts does not allow the PSC to determine all claims of wrongdoing against PEI.

## 2. Grain Warehouse and Dealer Claims

Appellant Christensen argues that he should have been classified as an owner of grain in storage, rather than as a dealer, because the delayed-price contract he signed was not an enforceable contract for the sale of grain and that therefore, he never transferred title to his grain in storage. The PSC found that the contract was enforceable and, thus, denied Christensen's warehouse claim.

Cross-appellants the Herians argue that their claim was improperly classified as a dealer claim rather than as a warehouse claim and that it was improper to deny their claim as a whole. The Herians base their argument on the fact that they retained ownership in grain in storage by way of an in-store transfer. The PSC found that because the Herians did not show an official in-store transfer notice, the Herians had not satisfied their burden of proving that an in-store transfer occurred.

Cross-appellants Donnelly Trust, TTK, and Gansebom argue that they should have received treatment as qualified check holders under the Grain Warehouse Act, because PEI executed checks to each in satisfaction of an oral contract.

Cross-appellant Raabe also argues that he should have received treatment as a qualified check holder, because he held a check executed by PEI but it was returned for insufficient funds after PEI closed. The PSC denied Raabe recovery as a qualified check holder.

(a) Statutory Scheme

As the PSC stated, "[t]he Grain Warehouse Act and the Grain Dealer Act . . . cover very distinct activity." Those who are licensed as grain warehouses can buy, sell, and store grain.[28] In contrast, grain dealers can act only as a dealer among buyers and sellers of grain.[29] Both the Grain Warehouse Act and the Grain Dealer Act require that a business licensed under such acts carry a "security" or bond that is available for the benefit of the licensee's customers and clients in the event that the licensee is closed down or goes out of business.[30] The security is in an amount set by the PSC, pursuant to its rules and regulations.[31] The warehouse bond and the dealer bond cannot be combined, because the activity covered by each bond is unique and the requirements for bond protection under each bond are different. Despite the different activities, a business, such as PEI, may, and often does, have a business model under which it is licensed to both store grain and deal grain, and thus, both acts apply to the business, but each act applies to a different part of the business.[32]

Upon the closure of a licensed grain warehouseman under the Grain Warehouse Act, the PSC takes title to and may sell all of the grain in storage to satisfy, pro rata, those entitled to payment under the Grain Warehouse Act.[33] Proceeds from the sale of this grain is subject to a first priority lien in favor of valid owners, depositors, or storers of grain who are holders

---

[28] See, e.g., *D.K. Buskirk & Sons v. State*, No. A-94-270, 1996 WL 45196 (Neb. App. Feb. 6, 1996) (not designated for permanent publication), *affirmed and remanded* 252 Neb. 84, 560 N.W.2d 462 (1997).

[29] *Id.*

[30] See §§ 88-530 and 75-903(4).

[31] *Id.*

[32] See, also, *D.K. Buskirk & Sons v. State, supra* note 28.

[33] § 88-547(1).

of evidence of ownership of grain.[34] This lien is preferred to any other lien or security interest in favor of any creditor of the warehouse licensee.[35] If the proceeds from the sale of grain are not enough to compensate all claimants, then the warehouse bond is also available for claimants that qualify under the Grain Warehouse Act.[36]

In contrast, upon the closure of a licensed grain dealer, those who have a dealer claim have only the dealer bond from which to recover.[37] In this case, this results in a full reimbursement to all claimants classified as warehouse claimants, as opposed to the $.09 per $1 due to those claimants under the Grain Dealer Act. Therefore, it is imperative to determine which claimants fall under which act.

### (b) Qualifications for Recovery Under Grain Warehouse Act

In order to qualify for the first priority lien under the Grain Warehouse Act, one must qualify as a valid owner, depositor, or storer of grain or as a qualified check holder.[38]

### (i) Storer of Grain in Warehouse

As the PSC stated in its order, the Grain Warehouse Act applies and covers "those who store their grain in a warehouse, but still own the grain." "Grain in storage" is defined as "any grain which has been received at any warehouse and to which title has not been transferred to the warehouseman by signed contract or priced scale ticket."[39] Therefore, anyone who owns

---

[34] *Id.*

[35] *Id.*

[36] §§ 88-530 and 88-547.01(2).

[37] § 88-547.

[38] See, § 88-547; 291 Neb. Admin. Code, ch. 8, §§ 001.01W, 002.05B, and 002.18C5 (2014).

[39] § 88-526(6).

"grain in storage" is considered a storer and entitled to recovery under the Grain Warehouse Act.

[18] We discussed the determination of an entity's status as owner, depositor, or storer of grain in *In re Claims Against Atlanta Elev., Inc.*[40] We stated that the statute

> establishes a temporal requirement, that is, a point in time at which the rights of entities claiming to be either "owners, depositors, or storers" of grain are fixed. . . . [A]n entity's status is determined "at that time" at which the PSC takes title to the grain stored in the warehouse, and it is an entity's status as an owner, depositor, or storer of grain in storage at such time that determines such entity's right to subsequently receive a pro rata distribution of the proceeds.[41]

In addition to a temporal requirement, we found that the statute also contains a physical requirement.[42] The grain must be "'stored in the warehouse'" at the time the PSC takes possession of the grain.[43] "The temporal and physical requirements necessarily result in preference being given to certain claimants who meet the requirements as compared to other entities who do not meet the requirements but nonetheless may have rights against the insolvent warehouse."[44]

Thus, it is significant to our analysis to determine the status of each individual or entity at the time the PSC took title to the grain on March 5, 2014.[45] In order to recover as an owner or

---

[40] *In re Claims Against Atlanta Elev., Inc.*, 268 Neb. 598, 685 N.W.2d 477 (2004) (superseded by statute as stated in *Telrite Corp. v. Nebraska Pub. Serv. Comm., supra* note 6).

[41] *Id.* at 606, 685 N.W.2d at 485 (quoting § 88-547(1)).

[42] *Id*. See, also, § 88-547(1).

[43] *Id.*

[44] *Mayfield v. Nebraska Pub. Serv. Comm.*, No. A-09-287, 2009 WL 5851467 at *2 (Neb. App. Dec. 15, 2009) (selected for posting to court Web site). See, also, *In re Claims Against Atlanta Elev., Inc., supra* note 40.

[45] See *In re Claims Against Atlanta Elev., Inc., supra* note 40.

storer of grain, each claimant must have held title to grain in storage on the date of the warehouse closure.

### (ii) Owner of Grain in Storage by Way of In-Store Transfer

A claimant may also qualify as an owner of grain in storage if an in-store transfer has been completed in satisfaction of a direct delivery obligation.[46] The Grain Warehouse Act provides that grain is considered "[d]irect delivery" if the grain is "bought, sold, or transported in the name of a warehouse licensee, other than grain that is received at the licensed warehouse facilities."[47] Typically, when grain is direct delivered, such grain falls under the Grain Dealer Act until such time as a postdirect delivery storage position is created.[48] However, "a producer may . . . direct-deliver grain to a third-party warehouse and, through an instore transfer, the warehouse licensee or grain dealer can transfer title to warehouse-owned grain to the producer, creating a postdirect delivery storage position in the producer."[49]

The warehouse licensee may incur a "[d]irect delivery obligation" upon delivery of direct delivery grain.[50] A direct delivery obligation means "the obligation of a warehouse licensee or grain dealer to transfer title to warehouse-owned grain to a producer by an in-store transfer upon the delivery of direct delivery grain."[51] Further, "[a] direct delivery obligation is treated as a grain dealer obligation until such time as it is satisfied by an in-store transfer."[52] However, if an

---

[46] § 88-526(2), (3), (7), and (8).

[47] § 88-526(2).

[48] See § 75-905(2).

[49] *Mayfield v. Nebraska Pub. Serv. Comm., supra* note 44, 2009 WL 5851467 at *3. See, also, § 88-526(2), (3), (7), and (8).

[50] § 88-526(3).

[51] *Id.*

[52] *Id.*

in-store transfer occurs, a postdirect delivery storage position occurs, and the producer or seller of grain acquires a position of a storer or owner of grain in the grain warehouse.[53]

In-store transfers occur when "a warehouse licensee transfers title to warehouse-owned grain to any person in satisfaction of a direct delivery obligation between the warehouse licensee or grain dealer and the producer, and the grain remains in the warehouse."[54] The PSC's regulations state that prima facie evidence of an in-store transfer is an "In-Store Transfer Notice" by the grain warehouse.[55]

### (iii) Qualified Check Holders

Also statutorily entitled to protection under the Grain Warehouse Act are those "qualified check holders" who hold "a check for purchase of grain stored in such warehouse which was issued by the warehouse licensee not more than five business days prior to the cutoff date of operation of the warehouse, which shall be the date the [PSC] officially closes the warehouse."[56]

The PSC interpreted all check holder claims under one rationale. The PSC stated that "[g]enerally, the [Grain] Warehouse Act is intended to provide protection for producers storing grain at the warehouse." However, the PSC went on to discuss grain storers' responsibility to act as "prudent and reasonable businesspeople and seek payment for sold grain in a timely fashion." The PSC then ruled that "[t]hose claimants who *sold* stored grain prior to [the 5 days prior to PEI's official closing] are not valid owners, depositors, or storers of grain or qualified check holders" and that thus, they were not valid claimants under the Grain Warehouse Act. (Emphasis supplied.)

---

[53] § 88-526(7).

[54] *Id.*

[55] 291 Neb. Admin. Code, ch. 8, § 002.07I (2014).

[56] § 88-530.

However, the PSC's interpretation of § 88-530 is incorrect. The plain language of the statute says that the check must have been "*issued* by the warehouse licensee not more than five business days prior to the cutoff date of operation of the warehouse."[57] The plain language of the statute makes the operative date for check holder claims the date the check was *issued*. In contrast, the PSC analyzed the check holders' claims from the date their grain was *sold* and *title transferred* to PEI. In order to determine which claims should have been granted pursuant to the issuance of checks, we must first determine what it means to "issue" a check in the context of the Grain Warehouse Act.

Black's Law Dictionary defines "issue" as "[t]o be put forth officially" or "[t]o send out or distribute officially."[58] Under Neb. Rev. Stat. U.C.C. § 3-105 (Reissue 2001), "issue" is defined as "the first delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the purpose of giving rights on the instrument to any person." "Delivery" is defined in Neb. Rev. Stat. U.C.C. § 1-201(15) (Cum. Supp. 2014) as the "voluntary transfer of possession." Black's Law Dictionary defines "delivery" as: "1. The formal act of voluntarily transferring something; esp., the act of bringing goods, letters, etc. to a particular person or place. 2. The thing or things so brought and transferred."[59]

[19] Accordingly, issuance of a check does not occur when the sale of grain occurs. Nor should the issuance of a check be defined as the date the check was written. Instead, issuance is the date that a check is first delivered by the maker or drawer, in this case, PEI.

---

[57] *Id.* (emphasis supplied).

[58] Black's Law Dictionary 960 (10th ed. 2014).

[59] *Id.* at 521.

(c) Qualifications for Recovery
Under Grain Dealer Act

A claimant who can qualify for recovery under the Grain Dealer Act must (1) be a producer or owner within Nebraska who has "a valid claim arising from a sale to or purchase from a grain dealer" and (2) takes action to recover payment for grain "*within thirty days*" of shipment, issuance of negotiable instrument, or any apparent loss to be covered under the terms of the grain dealer's security.[60] Therefore, the operative date under the Grain Dealer Act is 30 days from the time that the individual or entity last had contact with the grain dealer.

[20,21] Cross-appellants Donnelly Trust, Raabe, TTK, and Gansebom were classified as grain dealers by the PSC and denied recovery because their grain was not delivered within 30 days prior to the closure of the warehouse. These four cross-appellants assigned as error the denial of their recovery in general, but they did not specifically argue that they were erroneously denied recovery under the Grain Dealer Act, but instead merely argued that they were erroneously denied recovery under the Grain Warehouse Act. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[61] Errors that are assigned but not argued will not be addressed by an appellate court.[62] Because Donnelly Trust, Raabe, TTK, and Gansebom do not argue that the PSC erred in finding that their dealer claims were time barred, we will not address this issue.

---

[60] See §§ 75-903(4) and 75-905 (emphasis supplied).

[61] *Obad v. State*, 277 Neb. 866, 766 N.W.2d 89 (2009).

[62] *Epp v. Lauby*, 271 Neb. 640, 715 N.W.2d 501 (2006); *Borley Storage & Transfer Co. v. Whitted*, 271 Neb. 84, 710 N.W.2d 71 (2006); *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005).

### (d) Application of Grain Warehouse Act
### and Grain Dealer Act to
### Individual Claimants

#### (i) Christensen's Delayed-Price
#### Contract Is Valid Contract

Appellant Christensen argues that the contract he signed was never validly formed because it lacked the requisite "meeting of the minds" or mutual intent, and the price term was not fixed in the contract. The PSC found the plain terms of the contract stated that title to Christensen's grain in storage had transferred to PEI upon the signing of the contract.

[22-28] The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement that alters, varies, or contradicts the terms of a written agreement.[63] The parol evidence rule is designed to preserve the integrity and certainty of written documents against disputes arising from fraudulent claims or faulty recollections of the parties' intent as expressed in the final writing.[64] "Extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous."[65] A determination as to whether an ambiguity exists is made as a matter of law and on an objective basis, not by the subjective contentions of the parties.[66] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[67] "When a contract is unambiguous, the intentions of the parties must be determined from the contract itself."[68]

---

[63] *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000).

[64] *Traudt v. Nebraska P. P. Dist.*, 197 Neb. 765, 251 N.W.2d 148 (1977).

[65] *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 147, 655 N.W.2d 390, 403 (2003).

[66] *Sack Bros. v. Tri-Valley Co-op, supra* note 63.

[67] *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010).

[68] *Spanish Oaks v. Hy-Vee, supra* note 65, 265 Neb. at 147, 655 N.W.2d at 403.

Testimony seeking to prove the parties' intent is considered parol evidence.[69]

[29] Further, an argument that the claimant did not read or understand the document he or she was signing is no defense to the formation of a contract.

> [C]ourts will not permit a party to avoid a contract into which that party has entered on the grounds that he or she did not attend to its terms, that he or she did not read the document which was signed and supposed it was different from its terms, or that it was a mere form.[70]

In *In re Claims Against Atlanta Elev., Inc.*,[71] the claimants argued that they did not understand the terms of the contracts and that notwithstanding the terms of the contracts, they did not intend to sell grain to the elevator. The claimants also argued that because the priced-to-arrive contracts did not contain a specified price, the contracts were incomplete and therefore unenforceable.[72] We refused to allow the parties to avoid their contracts on the grounds that they did not understand or read the contracts' terms or assumed the contracts said something different from their terms.[73]

Also, Neb. Rev. Stat. U.C.C. § 2-204(3) (Reissue 2001) provides that "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness . . . ." With regard to an open price term, Neb. Rev. Stat. U.C.C. § 2-305(1) (Reissue 2001) provides that parties "can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if . . .

---

[69] See, e.g., *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015); *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010); *Sack Bros. v. Tri-Valley Co-op, supra* note 63.

[70] *In re Claims Against Atlanta Elev., Inc., supra* note 40, 268 Neb. at 617, 685 N.W.2d at 493.

[71] *In re Claims Against Atlanta Elev., Inc., supra* note 40.

[72] *Id.*

[73] *Id.*

(a) nothing is said as to price." Again, in *In re Claims Against Atlanta Elev., Inc.*, we found that even though the contracts did not contain a price term, the contracts were still enforceable, and that thus, title to the claimants' grain in storage passed and they could no longer make claims under the Grain Warehouse Act.[74]

The delayed-price contract Christensen signed is not ambiguous. The language plainly and clearly states that title transfers to PEI at the time the document is executed. The contract was signed and executed by both Christensen and PEI. Because we look only at evidence of the parties' intent when the contract is otherwise ambiguous—and this contract is unambiguous—we must follow the plain terms of the contract. Testimony as to the intent of both parties is inadmissible in this case. Finally, as we have previously established, the fact that Christensen did not read or have knowledge of what he was signing is no defense. The fact that the price term was not supplied is not determinative in priced-later or delayed-price contracts and does not make the contract unenforceable under §§ 2-204(3) and 2-305(1).

We affirm the determination of the PSC that Christensen did not hold title to grain in storage at the time of the closure of the warehouse.

### (ii) Herians' Potential Status as
### Owners of Grain in Storage
### Via In-Store Transfer

The PSC found that an in-store transfer was not executed in favor of the Herians. The PSC stated that "only upon the execution of an in-store transfer will an ownership interest in grain stored in a warehouse arise for a producer that direct delivered grain. Absent such a document, direct delivered grain will never result in an ownership position in grain stored in the elevator." The Herians argue that a document providing formal notice of an in-store transfer is merely prima facie

---

[74] *Id.*

evidence of an in-store transfer, but not determinative of whether an in-store transfer occurred. We agree.

In this case, there is no question that the Herians' grain was direct delivered to other licensed public grain warehouses. When PEI took possession of the Herians' grain and delivered it to third-party grain terminals rather than PEI's warehouse, the Herians' grain became direct delivery grain. According to § 88-526(3), this direct delivery should have created a "direct delivery obligation" on the part of PEI. This obligation is treated as a dealer obligation (and thus as a dealer claim) until such time as it is satisfied by an in-store transfer. Therefore, if the obligation was satisfied by an in-store transfer, then the Herians can be considered owners of grain in storage at the time PEI closed.

PEI did not issue a formal notice of an in-store transfer. The PSC treated the nonexistence of a formal and executed in-store transfer notice as determinative of whether an in-store transfer occurred. The PSC said that "[a]bsent such a document, direct delivered grain will never result in an ownership position in grain stored in the elevator." This is incorrect.

[30,31] Though notice of an in-store transfer is considered prima facie evidence that an in-store transfer occurred, it is not the only evidence that can establish the occurrence of an in-store transfer. Prima facie proof is evidence sufficient to submit an issue to the fact finder and precludes a directed verdict on the issue.[75] Black's Law Dictionary defines "prima facie evidence" as "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced."[76] However, although the statutes and regulations prescribe one form of evidence to establish a prima facie case that an in-store transfer occurred, other forms of evidence may also provide proof. A claimant may produce other forms of evidence that an in-store transfer occurred.

---

[75] See, *Bituminous Casualty Corp. v. Deyle*, 234 Neb. 537, 451 N.W.2d 910 (1990); *State v. Kipf*, 234 Neb. 227, 450 N.W.2d 397 (1990).

[76] Black's Law Dictionary, *supra* note 58 at 677.

Title to grain, or "goods" within the meaning of the Uniform Commercial Code, passes in any manner agreed to by the parties.[77] Therefore, without any legislation to the contrary, an in-store transfer may still be accomplished, even though the grain warehouse did not create a written notice, as it is commanded by statute. Also, while PEI certainly should have issued a notice of in-store transfer, the failure to issue that notice does not defeat the case that an in-store transfer occurred.

We find significant the fact that when the Herians chose to sell grain from "open storage" in January 2014, they were allowed to do so. Had PEI not completed an in-store transfer of the grain delivered in 2013, and given the Herians a postdirect delivery storage position, it is inexplicable why the Herians would not have been able to sell grain from open storage in January 2014. Though a representative of PEI explained that an indication of "open storage" on a settlement sheet is the default setting on all transactions, there is no reason why PEI would allow the Herians to "sell" 9,801.428 bushels, pay the Herians for such sale, and show in the records 27,742.05 remaining bushels in the Herians' name. There is also no explanation by PEI of this particular transaction or whether the "open storage" indication on the settlement sheet was indicative of the Herians' grain's position in this particular case.

As further support for its finding that no in-store transfer occurred, the PSC reiterated evidence that the Herians' grain was direct delivered to third-party terminals. The direct delivery of grain to third-party terminals does not defeat the claim of an in-store transfer. In fact, a direct delivery is the very thing that gives rise to an in-store transfer under § 88-526(7).

Acknowledging that the lack of an in-store transfer notice does not defeat the existence of an in-store transfer, and because the Herians produced other strong indicators that an in-store transfer occurred and that they had a postdirect

---

[77] See Neb. Rev. Stat. U.C.C. § 2-401 (Cum. Supp. 2014).

delivery storage status, we find that the Herians may recover under the Grain Warehouse Act as owners of grain in storage for their remaining bushels.

### (iii) Qualified Check Holder Claims

As an opening matter, the cutoff date according to statute is "five *business* days" before the PSC officially closes the warehouse.[78] The official closure date is the date that the PSC entered an order closing the warehouse, which was March 5, 2014. Five business days prior to the closure of the warehouse is Wednesday, February 26. Therefore, those who were holders of checks that were issued by PEI between February 26 and March 5 will qualify as check holders under § 88-530.

### a. Raabe Is Qualified Check Holder
### Under Grain Warehouse Act

PEI issued check No. 42900 to Raabe in the amount of $88,510.54 when PEI took the affirmative action of transferring possession of the check to Raabe on February 28, 2014. PEI's purpose in delivering the check was to create rights on the instrument in Raabe.

The closure of PEI's grain warehouse occurred on March 5, 2014. The statute allows recovery to all those holders of checks issued within 5 business days of the closure. When Raabe took delivery of the check on February 28, and became holder of the check on that date, he met the requirement of § 88-530. Thus, Raabe is entitled to recovery under the Grain Warehouse Act as a holder of check No. 42900 in the amount of $88,510.54.

### b. Donnelly Trust, TTK, and Gansebom
### Are Not Qualified Check Holders
### Under Grain Warehouse Act

Checks Nos. 43095, 43081, and 43080 to Donnelly Trust, check No. 43083 to TTK, and check No. 43157 to Gansebom

---

[78] § 88-530 (emphasis supplied).

were written, dated, and signed by PEI, but left undelivered in PEI's office at the time that PEI surrendered its license and the PSC took control of PEI.

Because the checks had yet to be delivered, PEI had not yet issued them. The delivery of the checks involves an affirmative action; and in this case, PEI took no action to deliver these checks to anyone. The cross-appellants argue that delivery occurred when PEI surrendered the warehouse to the PSC or when the PSC took control of PEI. However, in surrendering its business license to the PSC, PEI was taking no formal action regarding the checks specifically. The checks that remained in PEI's office or safe were never formally acted on, or delivered, and therefore, the checks that remained in PEI's office at the time of its closure were never issued.

Therefore, checks Nos. 43095, 43081, and 43080 to Donnelly Trust, check No. 43083 to TTK, and check No. 43157 to Gansebom were never issued and Donnelly Trust, TTK, and Gansebom do not qualify as check holders. As such, the PSC was correct to deny these three cross-appellants recovery under the Grain Warehouse Act.

### 3. No Standing to Challenge Classification of Uecker Transaction

Finally, cross-appellants Donnelly Trust, Raabe, TTK, and Gansebom argue that Uecker's transaction with PEI was a loan, and not a sale or forward contract, and that as such, he is not entitled to any recovery under the Grain Dealer Act. The PSC argues that the cross-appellants do not have standing to contest the classification of the Uecker transaction on appeal. We agree that Donnelly Trust, Raabe, TTK, and Gansebom do not have standing to contest the classification of the Uecker transaction.

[32-35] A party has standing to invoke a court's jurisdiction if it has a legal or equitable right, title, or interest in the

subject matter of the controversy.[79] As an aspect of jurisdiction and justiciability, standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify the exercise of the court's remedial powers on the litigants' behalf.[80] In order for a party to establish standing to bring suit, it is necessary to show that the party is in danger of sustaining a direct injury as a result of anticipated action, and it is not sufficient that one has merely a general interest common to all members of the public.[81] If the party appealing the issue lacks standing, the court is without jurisdiction to decide the issues in the case.[82]

Though all of the cross-appellants challenging the classification of Uecker's claim originally made claims as dealers, those claims were denied, and those cross-appellants do not argue on appeal that their grain dealer claim was improperly denied. Since none of the cross-appellants who contest the classification of this transaction are classified, or still stand to be classified as "dealers" under the Grain Dealer Act, none of them will receive a benefit from the grain dealer bond. Because claims under the Grain Warehouse Act and Grain Dealer Act seek recovery from two separate pots of money, one seeking an interest in the warehouse recovery is not asserting an interest in the dealer bond. Without an interest in the dealer bond, the cross-appellants have no standing to challenge the distribution of the dealer bond.

---

[79] *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010); *In re Application of Metropolitan Util. Dist.*, 270 Neb. 494, 704 N.W.2d 237 (2005).

[80] *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002).

[81] *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009); *Neb. Against Exp. Gmblg. v. Neb. Horsemen's Assn.*, 258 Neb. 690, 605 N.W.2d 803 (2000); *Ritchhart v. Daub*, 256 Neb. 801, 594 N.W.2d 288 (1999).

[82] *City of Omaha v. City of Elkhorn*, 276 Neb. 70, 752 N.W.2d 137 (2008).

Because these cross-appellants do not argue that the PSC erred in denying their dealer claims, they cannot show any injury or personal stake in that determination that would permit them to contest the allowance of Uecker's grain dealer claim. These cross-appellants thus lack standing to contest the PSC's approval of Uecker's claim under the Grain Dealer Act.

## VI. CONCLUSION

We affirm the finding of the PSC that it did not have jurisdiction to determine the fraud claims of appellant Christensen and of cross-appellants Gansebom and the Herians.

We affirm the finding of the PSC that appellant Christensen and cross-appellants Donnelly Trust, TTK, and Gansebom are not entitled to recovery under the Grain Warehouse Act.

We reverse the finding that cross-appellant Raabe is not a qualified check holder and find that he is entitled to recovery under the Grain Warehouse Act.

We reverse the finding that an in-store transfer did not occur, creating a postdirect delivery storage position in cross-appellants the Herians and find that they are entitled to recovery under the Grain Warehouse Act.

We find that cross-appellants Donnelly Trust, Raabe, TTK, and Gansebom do not have standing to challenge the classification of the Uecker transaction, and dismiss such claims.

Affirmed in part, and in part
reversed and dismissed.

Wright and Miller-Lerman, JJ., not participating.