Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/20/2018 09:11 AM CDT

Patrick Robinson, appellant, v. Morrill County
School District #63 and Morrill County
Board of Education, appellees.

___ N.W.2d ___

Filed April 26, 2018.    No. S-17-216.

1. **Schools and School Districts: Termination of Employment: Teacher Contracts: Evidence: Appeal and Error.** The standard of review in an error proceeding from an order of a school board terminating the contract of employment of a certificated employee is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. In this context, evidence is sufficient as a matter of law if a judge could not, were the trial to a jury, direct a verdict.

2. **Statutes: Judgments: Appeal and Error.** To the extent the assignments of error on appeal present issues of statutory interpretation or issues of law, an appellate court reaches an independent conclusion irrespective of the decision made by the court below.

3. **Schools and School Districts: Attorneys at Law.** Neb. Rev. Stat. § 79-513 (Reissue 2014) expressly authorizes school boards to hire legal counsel when it deems it necessary or advisable.

4. **Due Process.** The concept of due process embodies the notion of fundamental fairness and defies precise definition.

5. **Constitutional Law: Due Process.** When a person has a right to be heard, procedural due process includes notice to the person whose right is affected by a proceeding, that is, timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker.

6. **Judges: Juries: Administrative Law: Presumptions: Proof.** As a general rule, decisionmakers are presumed to be impartial and unbiased; the burden of showing otherwise rests on the party making the assertion.

7. **Schools and School Districts: Teacher Contracts: Evidence.** A school board can consider all relevant conduct when determining whether to cancel a contract.

8. **Teacher Contracts: Termination of Employment: Words and Phrases.** For purposes of cancellation of an employment contract under Neb. Rev. Stat. § 79-827 (Reissue 2014), "incompetency," as defined by Neb. Rev. Stat. § 79-824(4)(a) (Reissue 2014), includes "demonstrated deficiencies or shortcomings in knowledge of subject matter or teaching or administrative skills."

9. **Teacher Contracts: Words and Phrases.** Teacher incompetency is not measured in a vacuum or against a standard of perfection but, instead, must be measured against the standard required of others performing the same or similar duties.

10. **Teacher Contracts: Termination of Employment: Words and Phrases.** For purposes of cancellation of an employment contract under Neb. Rev. Stat. § 79-827 (Reissue 2014), "neglect of duty" generally requires evidence of something more than occasional neglect. Evidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination.

11. ____: ____: ____. For purposes of cancellation of an employment contract under Neb. Rev. Stat. § 79-827 (Reissue 2014), "unprofessional conduct" must be conduct directly related to the fitness of the employee to act in his or her professional capacity.

12. ____: ____: ____. For purposes of cancellation of an employment contract under Neb. Rev. Stat. § 79-827 (Reissue 2014), "insubordination" is the absence of subordination or submission, resistance to or defiance of authority, refusal to obey orders, refractoriness, or disobedience.

13. **Courts: Appeal and Error.** In an error proceeding, issues not presented to the district court are not preserved for appellate review.

Appeal from the District Court for Morrill County: Leo P. Dobrovolny, Judge. Affirmed.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellant.

Steven W. Olsen and John L. Selzer, of Simmons Olsen Law Firm, P.C., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Funke, JJ.

Per Curiam.

A school board canceled the contract of a certificated employee after holding a formal hearing. The employee filed a petition in error in the district court, which affirmed the cancellation.[1] The employee now appeals, raising various issues regarding notice and due process in addition to challenging the merits of the cancellation. We affirm.

## I. FACTS

In the fall of 2013, Patrick Robinson was hired as the curriculum and assessment coordinator at Bridgeport Public Schools pursuant to a contract with the Bridgeport Public Schools Board of Education (school board).[2] In February 2015, Robinson was notified his contract was being canceled. He requested and received a hearing before the school board, and the following evidence was adduced.

### 1. Veterans Day Incident

In November 2013, the community of Bridgeport, Nebraska, held a Veterans Day celebration at the school on a nonschool day. A portion of the parking lot was reserved for veterans attending the celebration. Robinson, who served in Iraq with the U.S. Army, came to the school that day to work and parked in the veteran's parking area. A teacher, and later an administrator, approached him and asked him to move his car, explaining the intent was to reserve the parking spaces for older or disabled veterans who would have difficulty with mobility. Robinson became angry and refused to move his

---

[1] See Neb. Rev. Stat. §§ 25-1901 to 25-1908 (Reissue 2016).

[2] See Neb. Rev. Stat. §§ 79-101 and 79-818 (Reissue 2014).

car. Robinson generally felt he was treated unfairly during the incident.

## 2. December 2013 Incident With Student

In December 2013, two teachers at Bridgeport observed an eighth grade student standing at her locker, laughing. When they asked what she was laughing about, the student told them Robinson had left a funny note in her locker. She told the teachers she thought Robinson was very funny and said "we game or do something together." The teachers thought it was odd that Robinson had accessed the student's locker. They understood the student's comment to relate to some sort of online gaming activity and were concerned that Robinson and the student may be involved in an inappropriate relationship. The teachers informed a school administrator of the incident and their concerns, which was a reporting procedure that conformed with school policy.

An administrator investigated the incident by questioning the student, her parents, and Robinson, and determined there was no inappropriate conduct. Robinson received a letter from the administration on January 16, 2014, stating the incident had been investigated and no wrongdoing was found.

## 3. Fellow Teacher Breach of Confidentiality

Before Robinson received the January 16, 2014, letter reporting no wrongdoing had been found, one of the reporting teachers told the athletic director about the locker incident. The athletic director then told Robinson that two teachers had reported him, and Robinson understood the teachers had accused him of grooming a student for a sexual relationship. Robinson informed administrators about the reporting teacher's breach of confidentiality. The administration conducted an investigation and reprimanded the teacher for telling the athletic director about the report. The written report of this investigation was dated March 6, 2014, and reiterated that

Robinson had not engaged in an inappropriate relationship with a student. The report also stated the superintendent had investigated and had found there was no harassment directed toward Robinson after the December 2013 incident.

### 4. Robinson's General Conduct

Beginning in January 2014, Robinson started refusing to come out of his office at school to meet or interact with other staff members. Robinson was upset about the allegations and the administration's response. Robinson believed school employees continued to talk about the incident and perpetrate the rumor that he was a sexual predator. He felt his reputation had been tarnished and did not think the administration had acted to stop the rumors or protect his reputation.

Robinson complained to both the teachers' union and the Department of Education about the administration's failure to protect him from what he perceived as continued accusations after the December 2013 incident. He informed others that the principal had harassed and disparaged him and should be fired. He told a school board member that the superintendent should "back off" from evaluating him. In early January 2014, Robinson received emails from other school employees asking general questions about the school's curriculum and interpreted the emails as attacks on his decisionmaking ability and competence. In February 2014, Robinson was told by administrators as part of his employee evaluation that he needed to start interacting with fellow staff members.

At Robinson's request, he met with the school board in February 2014 to discuss the concerns he had with the school administration. After the meeting, Robinson gave a written summary of his complaints to an attorney the school board hired to investigate the matter. Robinson subsequently refused to meet with this attorney.

Chuck Lambert took over as superintendent at Bridgeport in June 2014, while the situation with Robinson was ongoing. Lambert met with Robinson in June and told him he would look into his complaints, but asked Robinson to view the new

administration as a clean slate and an opportunity to work to move forward. An attorney representing the school board sent a letter to Robinson's attorney in July addressing Robinson's continuing concerns about the December investigation and stating the school district found no wrongdoing and considered the matter closed.

When classes started in the fall of 2014, Robinson continued to seclude himself in his office. He avoided interacting with school staff except through email. At least once in August 2014, Robinson perceived a communication relating generally to school business as a personal attack on him. Robinson testified at the hearing that he considered his work environment hostile, because he never received an apology after the December 2013 incident and did not think he had been told he was cleared of any wrongdoing over the incident with the student.

### 5. August 28, 2014,
#### Union Meeting

On August 28, 2014, after the school term had started, the teachers' union held a meeting at the community center in Bridgeport. The meeting was called by legal representatives of the union, and its general purpose was to inform members of the union that Robinson had filed a complaint against the union, alleging failure to provide representation. At this meeting, the union explained how Robinson's complaint would be addressed and warned the members not to engage in any type of retaliatory action toward Robinson. Robinson was not invited to the meeting, but was aware it had been scheduled. He asked another Bridgeport teacher to attend the meeting, hide a tape recorder in her backpack, and record the meeting for him. She did so.

Robinson listened to the recording the next day and was upset by what he heard. Generally, the recording demonstrated that although the meeting was intended as an informational session and an opportunity for counsel to give general legal advice to union members, various attendees made unflattering

comments about Robinson. Several noted they were afraid of him, and one expressed fear that Robinson might bring a gun to school. One referred to Robinson as a "creep." Another said he was not a "normal, stable-minded person." When the attendees were advised to let the administration know if Robinson made a threatening comment, one stated, "But I think that's how this all got started." Another attendee warned everyone to avoid the athletic director, explaining that the athletic director was "on [Robinson's] side."

The day after the union meeting, the Bridgeport principal sent Robinson an email asking if Robinson could meet with him and several teachers to review some new curriculum. Robinson perceived the email as a threat, apparently because he thought the curriculum meeting would be attended by some of the same teachers who made unflattering comments about him at the union meeting. Robinson forwarded the principal's email to Lambert, the superintendent. Robinson informed Lambert that he perceived the proposed meeting as an attempt to make him uncomfortable by forcing him to face his accusers, and he declined to attend unless Lambert ordered him to do so. Robinson also forwarded Lambert an email he received from an administrator requesting some staff training and informed Lambert he did not wish to meet with a certain staff member because she was the leader of a "lynch mob" against him. Additionally, Robinson emailed Lambert to inform him that, because of what had been said about him at the union meeting, he would not attend any athletic events involving the school.

On Monday, September 1, 2014, Robinson emailed Lambert and requested that Lambert have a school district representative contact Robinson's attorney. The next day, Robinson sent Lambert a reply to an email that was 6 months old and related to the school safety plan. Robinson's reply pointed out that the plan contained various spelling errors. Lambert responded by thanking Robinson for the input but asking why Robinson was responding to such an old email. After sending Lambert two

additional emails generally indicating that he thought Lambert was attacking him, Robinson went home sick.

### 6. Meeting With Superintendent

Lambert did not know about the August 28, 2014, union meeting until after it occurred. Once he received the emails from Robinson on August 29 and September 1 and 2, Lambert was concerned about Robinson's behavior, so he went to Robinson's office to talk with him. Robinson tape recorded the conversation without Lambert's knowledge. During this conversation, Lambert asked Robinson, "Do you see that your struggle with the past is affecting you now?" And, "Do you understand that the feelings that you have . . . will make it really tough for us to function and get to where we need to be?" Robinson responded, "Yes, I get that completely." The record shows that during 2013 and 2014, Robinson also tape recorded other meetings with school employees without their knowledge or consent.

On September 4, 2014, Lambert gave Robinson a letter informing him he was being suspended with pay. The letter referenced Robinson's inability to work collaboratively with other school personnel.

In February 2015, Lambert notified Robinson that the school was canceling his contract. Robinson requested and received a hearing before the school board.[3] After the hearing, the school board voted unanimously to cancel his contract. Robinson filed a petition in error in the Morrill County District Court,[4] which affirmed. He filed this timely appeal, which we moved to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Robinson assigns, restated and consolidated, that the district court erred in finding (1) notice of the school board hearing

---

[3] See Neb. Rev. Stat. § 79-827(2) (Reissue 2014).

[4] See Neb. Rev. Stat. § 79-833 (Reissue 2014).

was proper, (2) Robinson's due process rights were not violated prior to his suspension, (3) the school board's use of a hearing officer was proper, (4) evidence of Robinson's conduct during a previous contract period was properly received to support terminating the present contract, (5) the school board did not improperly rely on documents not received in evidence, and (6) there was sufficient evidence to establish a lack of professionalism and insubordination.

## III. STANDARD OF REVIEW

[1] The standard of review in an error proceeding from an order of a school board terminating the contract of employment of a certificated employee is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision.[5] In this context, evidence is sufficient as a matter of law if a judge could not, were the trial to a jury, direct a verdict.[6]

[2] To the extent the assignments of error on appeal present issues of statutory interpretation or issues of law, we reach an independent conclusion irrespective of the decision made by the court below.[7]

## IV. ANALYSIS

### 1. Notice of March 6, 2015, Meeting Was Proper

Robinson received advance written notification of a March 6, 2015, hearing on whether to cancel his employment contract,[8] and he was present and represented by counsel at the hearing. Robinson does not dispute that he had actual notice

---

[5] See *McQuinn v. Douglas Cty. Sch. Dist. No. 66*, 259 Neb. 720, 612 N.W.2d 198 (2000).

[6] *Id.*

[7] See *J.S. v. Grand Island Public Schools*, 297 Neb. 347, 899 N.W.2d 893 (2017).

[8] See Neb. Rev. Stat. § 79-832(1) (Reissue 2014).

of the hearing, but he argues the school board failed to give "[d]ue and proper notice of the hearing" "in accordance with the Open Meetings Act" as required by § 79-832(2).

The Open Meetings Act requires "reasonable advance publicized notice of the time and place of each meeting by a method designated by each public body and recorded in its minutes."[9] The record shows that on February 24, 2015, the school board posted notice of the March 6 meeting at three local Bridgeport establishments: "Sonny's Super Foods," "Jack & Jill," and "Prairie Winds Community Center." This method of notice was used by the board and recorded in its minutes at least 21 times between January 14, 2013, and February 9, 2015. Board minutes also show that on other occasions, the board published notice of meetings in the local newspaper. As between these two methods of notice, the record shows the board published notice in the newspaper approximately 60 percent of the time and posted notice at local establishments approximately 40 percent of the time.

The district court found notice was given in accordance with law. Robinson argues the meeting notice was improper because (1) the customary practice of the board was notice by publication and (2) the minutes of the March 6, 2015, meeting did not reflect how notice was given. We reject each of these arguments.

The record shows the board gave notice of the March 6, 2015, meeting using a method it had used regularly over the 2 preceding years. We conclude this was "reasonable advance publicized notice . . . by a method designated by [the board]."[10] As for Robinson's argument that the method of notice was not properly recorded in the minutes of the March 6, 2015, meeting, we find any such omission to be irrelevant. The intent of the notice requirement is to adequately notify the public, in advance of the meeting, when and where the meeting will take

---

[9] Neb. Rev. Stat. § 84-1411(1) (Reissue 2014).

[10] § 84-1411(1).

place,[11] and the record shows this was accomplished. This court has never held that the failure to record the particular method of notice used nullifies actual notice properly given, and we decline to do so here. To the contrary, in a related context, we held in *Schauer v. Grooms*[12] that even though a designated method of service was not formally set forth in the minutes as such, § 84-1411(1) is satisfied by evidence from which one could "discern, through the minutes of past meetings, a customary and consistent method of notifying the public."[13]

Here, the record shows the method used to provide public notice of the March 6, 2015, meeting was used by the board and recorded in its minutes at least 21 times between January 14, 2013, and February 9, 2015. It further shows both Robinson and members of the public were given reasonable advanced notice of and attended the meeting. The district court did not err in finding that notice was given in accordance with the law.

## 2. Use of Hearing Officer
### Not Improper

The school board hired an attorney—referred to by the parties as a "hearing officer"—to preside over Robinson's hearing.[14] Robinson objected to this procedure, arguing the use of a hearing officer was not statutorily authorized.

Nebraska statutes allow a Class IV or Class V school district to use a hearing officer when the issue of termination of a certificated employee is determined.[15] These statutes require the parties to select the hearing officer and authorize the hearing officer to actually conduct the hearing and serve as the fact finder who makes recommendations to the board for its

---

[11] See *Schauer v. Grooms*, 280 Neb. 426, 786 N.W.2d 909 (2010).

[12] *Id.*

[13] *Id*. at 443, 786 N.W.2d at 924.

[14] See, generally, Neb. Rev. Stat. § 79-513 (Reissue 2014).

[15] Neb. Rev. Stat. §§ 79-840 to 79-842 (Reissue 2014).

final decision.[16] Bridgeport is not a Class IV or Class V school district, and thus, Robinson is correct that the use of a hearing officer was not authorized by these statutes. We conclude, however, that the attorney hired by the school board was not the sort of hearing officer referenced in these statutes and that the procedure used was not improper.

After Robinson objected to the use of a hearing officer, the attorney representing the school administrators in the hearing explained that the attorney hired by the school board was not acting in the capacity of a "hearing officer" statutorily authorized for Class IV and Class V school districts, but instead was presiding over the proceedings, a role that was "extremely helpful" to the school board, which lacked "legal training." The hearing officer himself explained on the record that it was "customary" for school boards to seek outside counsel to help conduct hearings in similar situations. He noted that his role was to "see that this hearing is conducted fairly and efficiently and in a manner consistent with Nebraska law" and emphasized that it was the board's duty "to determine what the facts are." Indeed, the hearing officer expressly stated, "I have no involvement in the ultimate determination made by the [b]oard. My role is to conduct the hearing and then assist the [b]oard through the process."

Whether characterized generally as a "hearing officer" or more precisely as counsel hired by the school board, we find no error in the school board's retention and use of counsel to conduct and oversee the hearing on behalf of the board. The board hired an attorney to preside over the hearing, rule on objections, and receive the evidence to be considered by the board. This attorney did not function as the fact finder and thus was not the type of hearing officer statutorily authorized for Class IV and Class V school districts.

[3] Both Robinson and the administration were represented at the hearing by counsel, and the school board hired

_____

[16] *Id.*

an attorney to preside over the proceedings. Section 79-513 expressly authorizes the board to hire legal counsel when it deems it "necessary or advisable," and no party directs us to a statute, regulation, or practice that prohibits the procedure followed here. We reject Robinson's invitation to adopt a blanket rule that precludes school boards from employing counsel to help the board conduct hearings of this nature.

### 3. Decisionmaker Was Impartial

[4-6] Robinson also argues his procedural due process rights were violated because the school board was not impartial. The concept of due process embodies the notion of fundamental fairness and defies precise definition.[17] But "'"the central meaning of procedural due process [is] clear: 'Parties whose rights are to be affected are entitled to be heard . . . .'"'"[18] Thus, we have said:

> "When a person has a right to be heard, procedural due process includes notice to the person whose right is affected by a proceeding, that is, timely notice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker."[19]

Robinson argues the board was not an impartial decisionmaker for several reasons, which we discuss in turn. Prior to doing so, we note that as a general rule, decisionmakers are presumed to be impartial and unbiased; the

---

[17] *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

[18] *Id.* at 165, 887 N.W.2d at 512.

[19] *Id.* at 165, 887 N.W.2d at 513.

burden of showing otherwise rests on the party making the assertion.[20]

### (a) Prior Knowledge

Robinson asserts the board was not impartial, because it knew of the issues related to Robinson's contract prior to the hearing. The record does indicate that board members had some prior knowledge of the December 2013 incident with the student and Robinson's resulting allegations that his reputation was not being protected by the administration. However, this is only because Robinson himself requested a meeting with the board in the early part of 2014 to present his complaints. The record shows that beyond this communication, the board had no other information about Robinson's work performance, because the administration followed protocol and did not discuss confidential employee matters with the board. Moreover, when questioned on the record by the hearing officer and Robinson's counsel prior to the receipt of the evidence, each board member affirmatively stated he or she would base a decision "solely on the evidence received as a part of this hearing and exclude anything [he or she] may have heard or read about this matter prior to the hearing." On this record, Robinson failed to show the board's impartiality was affected by prior knowledge.

### (b) Hearing Officer's Participation

Robinson also claims the board was not impartial because, he asserts, the hearing officer "participat[ed] in the deliberations."[21] Robinson suggests there is circumstantial support for his assertion because (1) when referencing the board's decision to go into closed session to deliberate, the hearing officer used the collective term "we" when referring to the board, and

---

[20] *Schweiker v. McClure*, 456 U.S. 188, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982).

[21] Brief for appellant at 26.

(2) the hearing officer was present with the board during the closed session.

As noted, at the commencement of the hearing, Robinson questioned the hearing officer's role and the hearing officer explained that his role was limited to conducting the hearing and advising the board throughout the process, and he would have "no involvement in the ultimate determination made by the [b]oard." Moreover, before receiving evidence, the hearing officer instructed the board on its role as the fact finder and told the board what it could and could not consider in making its decision. As part of that instruction, the hearing officer admonished the board, "Do not take anything I say or do as expressing my opinion as to how this case should come out or how you should resolve any issue of fact."

On this record, the hearing officer's reference to "we" and his presence with the board during closed session are insufficient to show the board was not an impartial decisionmaker.

### (c) Consideration of Documents
### Not Received

Robinson also argues the board was not impartial because it considered matters outside the record during its deliberation. Before addressing this argument, we provide some additional background.

Prior to the hearing, counsel for the administration prepared binders containing each proposed exhibit. The binders were distributed to each board member immediately before the hearing commenced. The board was instructed not to look at any exhibit until it was offered and received, and this procedure was followed by both counsel during the hearing. The record shows that before deliberations, in the presence of counsel and Robinson, any exhibit in the binders that had not been received into evidence was removed at the direction of the hearing officer and left on a table in the hearing room to be recycled. It appears the hearing officer kept an original binder with all exhibits in order to preserve them for the record.

The record shows that approximately 50 exhibits were included in the binders but not received at the hearing. However, the only exhibit Robinson specifically contends the board improperly considered is exhibit 108. That exhibit is a February 26, 2015, letter sent to Robinson and his counsel by the administration's attorney. The letter recited the allegations against Robinson and provided a detailed summary of the exhibits and testimony the administration expected to adduce at the hearing. Exhibit 108 was admitted at the hearing, but only for the limited purpose of showing the administration had complied with statutory notice requirements.[22] And at the conclusion of the evidence, the hearing officer directed each board member to remove exhibit 108 from his or her binder, along with the other exhibits that had not been received.

Robinson argues the board's ultimate factual findings supporting the decision to cancel his contract were similar to the information contained in exhibit 108, and he speculates this could only have happened if the board members kept a copy of exhibit 108 in their binders or the hearing officer's copy was used in deliberations.

While there is similarity between the substantive content of exhibit 108 and the board's ultimate factual findings, that is not surprising. Exhibit 108 was the administration's prehearing disclosure of the alleged grounds for cancellation, the reasons supporting cancellation, and a summary of the anticipated exhibits and testimony of each witness. In other words, exhibit 108 laid out in detail what the administration intended to prove at the hearing. The boards' findings after the hearing tracked with the issues and evidence presented, and reflected what it determined the administration had proved. Rather than suggesting reliance on materials outside the record, the board's findings merely reflect that the administration carried its burden of proof.

─────────

[22] See § 79-832.

On the record before us, Robinson has not shown the board's impartiality was affected by exhibit 108. Robinson does not argue why inclusion of any of the other 50 exhibits in the binders during the hearing was prejudicial to him, and we therefore do not address any of the other exhibits.[23]

### (d) Motion for Closed Session

After all parties had presented their evidence to the school board, the hearing officer informed the board that it could move to conduct its deliberations in closed session. A board member so moved, the motion was seconded, and on a roll call vote, all members of the board affirmatively voted to deliberate in closed session. The hearing officer then stated on the record that the board was going into closed session at 7:44 p.m. in a nearby conference room for its deliberations. Robinson did not object to the closed session or the process followed by the board, but did ask that the court reporter remain in the hearing room in case "the board members . . . end up having a question that needs to have discussion." At 10:36 p.m., the board reconvened in open session and announced on the record its proposed findings of fact and proposed decision.

On appeal, Robinson argues the motion to go into closed session did not comply with the Open Meetings Act.[24] The school board relies on this court's decision in *McQuinn v. Douglas Cty. Sch. Dist. No. 66*[25] to argue that § 84-1410, which sets out the procedure for public bodies to hold closed sessions, has no application here, because the school board was acting in a judicial function and not as a public body.

We do not address either argument, because Robinson's failure to object to the closed session or to challenge the

---

[23] See, *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015); *Obad v. State*, 277 Neb. 866, 766 N.W.2d 89 (2009).

[24] See Neb. Rev. Stat. § 84-1410 (Reissue 2014).

[25] *McQuinn, supra* note 5.

procedure followed in connection therewith, effectively waived the argument he seeks to present on appeal. This assignment of error is without merit.

### 4. Evidence of Conduct in Prior Contract Period Admissible

During the hearing, Robinson repeatedly objected to the admission of any evidence related to his conduct outside the time period from August 13 through September 4, 2014. He argued this was the only relevant time period, because the issue was whether his current contract, effective August 13, should be canceled, and he was suspended on September 4. The hearing officer overruled each of these objections, reasoning the board was not prohibited from considering conduct from a prior contract period in determining whether the current contract should be canceled.

[7] Our prior case law demonstrates that a school board can consider all relevant conduct when determining whether to cancel a contract. In *Hollingsworth v. Board of Education*,[26] we reversed the district court's judgment affirming a school board's termination of a tenured teacher's contract. In doing so, we referenced evidence related to the teacher's entire 2½-year teaching career at the school and did not limit our analysis to only the year prior to the termination. We applied a similar analysis in *Schulz v. Board of Education*.[27]

Here, evidence related to the incidents that occurred during the prior contract period—particularly the December 2013 incident involving the student—was intertwined with Robinson's conduct thereafter and his deteriorating job performance. As such, the evidence was necessary to understanding and evaluating the reason for Robinson's continued inability to work collaboratively with his fellow school

---

[26] *Hollingsworth v. Board of Education*, 208 Neb. 350, 303 N.W.2d 506 (1981).

[27] *Schulz v. Board of Education*, 210 Neb. 513, 315 N.W.2d 633 (1982).

employees and thus was relevant to determining whether his current contract should be canceled. We agree with the district court that there is no merit to Robinson's argument that this evidence was irrelevant and should have been excluded.

### 5. Sufficient Evidence to Support Canceling Contract

Pursuant to § 79-827, the contract of any certificated employee may be canceled by a majority of the members of the school board during the school year for, among other things, incompetency,[28] neglect of duty,[29] unprofessional conduct,[30] or insubordination.[31] The board canceled Robinson's contract after finding he had acted in an unprofessional manner, neglected his duties, been insubordinate, and not acted in a competent manner.

Robinson argues there was insufficient evidence in the record to support the cancellation of his contract. The district court found there was sufficient evidence as a matter of law to support the board's decision. We agree with the district court.

### (a) Incompetency and Neglect of Duty

[8,9] "Incompetency," in the context of this case, includes "demonstrated deficiencies or shortcomings in knowledge of subject matter or teaching or administrative skills."[32] We have held that teacher incompetency is not measured in a vacuum or against a standard of perfection but, instead, must

---

[28] § 79-827(1)(d).

[29] § 79-827(1)(e).

[30] § 79-827(1)(f).

[31] § 79-827(1)(g).

[32] Neb. Rev. Stat. § 79-824(4)(a) (Reissue 2014). Accord *Boss v. Fillmore Cty. Sch. Dist. No. 19*, 251 Neb. 669, 559 N.W.2d 448 (1997).

be measured against the standard required of others performing the same or similar duties.[33]

Robinson was the curriculum coordinator. There was considerable evidence demonstrating his shortcomings in administering his coordinator duties. For example, he refused to attend meetings with staff and administration. He refused to leave his office, even after being directed to stop secluding himself. And he refused to work collaboratively with staff and administration on curriculum and testing issues.

[10] "Neglect of duty" is not defined in the applicable statute, but our cases have recognized that, generally, there must be evidence of something more than occasional neglect. "'Evidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination.'"[34]

The record contains sufficient relevant evidence showing more than just occasional incompetence or neglect of a particular duty. Lambert testified that after Robinson was suspended, Lambert discovered significant discrepancies related to curriculum orders made by Robinson that had to be rectified. Specifically, Robinson had lied about certain purchases for the curriculum and had exchanged inappropriate and unprofessional emails with a district curriculum vendor. On this record, the evidence of incompetency and neglect of duty was sufficient to support the board's decision.

### (b) Lack of Professionalism and Insubordination

[11,12] "Unprofessional conduct" is not defined in the applicable statute, but we have explained that it must be

---

[33] *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985).

[34] *Boss, supra* note 32, 251 Neb. at 676, 559 N.W.2d at 453, quoting *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978).

conduct directly related to the fitness of the employee to act in his or her professional capacity.[35] "[I]nsubordination" is defined as the "absence of subordination or submission; resistance to or defiance of authority; refusal to obey orders; refractoriness, [or] disobedience."[36]

The evidence demonstrating Robinson's lack of professionalism and insubordination in the workplace was substantial. Summarized, the evidence showed that as the result of real or perceived slights, Robinson grew increasingly antagonistic toward other teachers and the administration. Despite encouragement from the administration to start fresh, Robinson perpetuated past conflicts, refused to come out of his office, refused to attend meetings to discuss curriculum, and refused to interact or collaborate with other teachers. He secretly tape recorded conversations with school staff, including Lambert, and responded with hostility to discussions regarding his job performance or curriculum. Robinson commented that he may "go nuclear" and that other employees should not "pick a fight" with him.

All of this conduct resulted in a dysfunctional working environment. Robinson admitted he lacked a functional relationship with at least eight members of the Bridgeport staff, which he also admitted was unprofessional. In addition, Lambert testified that professional conduct required an ability to respond to criticism in a healthy way and to develop working relationships with colleagues; the record shows Robinson did neither. Robinson's refusal to come out of his office and attend meetings to discuss curriculum can fairly be characterized as insubordinate behavior.

We conclude there was sufficient evidence as a matter of law to support the board's finding that Robinson's conduct was unprofessional and insubordinate.

---

[35] See, *Daily v. Board of Ed. of Morrill Cty.*, 256 Neb. 73, 588 N.W.2d 813 (1999); *Boss, supra* note 32.

[36] "Insubordination," Oxford English Dictionary Online, http://www.oed. com/view/Entry/97185 (last visited April 12, 2018).

### 6. PRESUSPENSION ERROR
### NOT PRESERVED

[13] Robinson contends the school violated his due process rights when it suspended him with pay in September 2014. His petition in error enumerated 32 assignments of error, but there was no error assigned to suspending him with pay. As such, the issue was not before the district court in the error proceeding and has not been preserved for appellate review.[37]

## V. CONCLUSION

For the foregoing reasons, we affirm the decision of the district court affirming the board's cancellation of Robinson's contract.

AFFIRMED.

WRIGHT and KELCH, JJ., not participating.

---

[37] See *McQuinn, supra* note 5 (error not asserted in petition in error not preserved for appellate review).